777 A.2d 385 (2001)
342 N.J. Super. 536
NEW JERSEY ASSOCIATION OF HEALTH PLANS, Plaintiff,
v.
John J. FARMER, Jr., in his official capacity as Attorney General of the State of New Jersey, Karen L. Suter, in her official capacity as Commissioner of the Department of Banking and Insurance of the State of New Jersey, and the New Jersey Insolvent Health Maintenance Organization Assistance Association, Defendants.
Superior Court of New Jersey, Chancery Division, Mercer County.
Decided November 14, 2000.
*391 Orloff, Lowenbach, Stifelman & Siegel, for plaintiff (Eileen A. Lindsay appearing and Laurence B. Orloff, on the brief, Roseland) and Phillip E. Stano of the Alabama and Washington, D.C. bars, admitted pro hac vice, and Jason H. Gould of the New York and Washington, D.C. bars, admitted pro hac vice, appearing (Jorden, Burt, Boros, Cicchetti, Berenson & Johnson, Washington, DC).
John J. Farmer, Jr., Attorney General, for defendants (Emerald Erickson Kuepper, Deputy Attorney General appearing; Ms. Kuepper and Julie D. Barnes, Deputy Attorneys General, on the brief).
Jamieson, Moore, Peskin & Spicer, Morristown, for amicus curiae New Jersey Hospital Association (Ross A. Lewin appearing and Michael J. Canavan, on the brief).
Joseph D. Glazer, Princeton, for amici curiae Hospital Alliance of New Jersey and University Health System of New Jersey.
Kern, Augustine, Conroy & Schoppmann, Bridgewateer, for amici curiae the Medical Society of New Jersey and the HIP-NJ Creditors' Advisory Committee to the Liquidator (Robert J. Conroy appearing). *386 *387 *388 *389
*390 PARRILLO, P.J.Ch.
At issue is the constitutionality of the Insolvent Health Maintenance Organization Assistance Fund Act of 2000, N.J.S.A. 17B:32B-1 et seq. (the "Act"), that levies $50,000,000 in aggregate assessments against all HMOs writing non-Medicaid business in New Jersey to help pay the pre-insolvency claims of medical providers against two insolvent HMOsHIP Health Plan of New Jersey, Inc. ("HIP") and American Preferred Provider Plan, Inc. ("APPP").
The Act's stated purpose is to protect, subject to certain limitations, covered individuals and providers against the "failure or inability of [HIP] and [APPP] to perform certain contractual obligations due to their insolvency ... [but] is intended to provide only limited coverage of claims against [HIP] and [APPP]." N.J.S.A. 17B:32B-2. "Provider" is defined as a "physician, hospital or other person who is licensed or otherwise authorized by this State ... to provide health care services, and which provided health care services to covered individuals" (N.J.S.A. 17B:32B-3) and also includes persons who provided "home health care services, durable medical equipment, physical therapy services, medical transportation, ambulance services or laboratory services to covered individuals." Id.
The Act's objective is accomplished through the creation of the New Jersey Insolvent Health Maintenance Organization Assistance Fund ("HMO Fund")a temporary and limited-purpose "guaranty" trust fund (N.J.S.A. 17B:32B-6a)to be utilized solely to pay the covered pre-insolvency provider claims against HIP and APPP. N.J.S.A. 17B:32B-2. The HMO Fund consists of $100,000,000, with $50,000,000 from the State's settlement with the tobacco manufacturers, and $50,000,000 in assessments collected over a period of not more than three years from all HMOs transacting business in this State. N.J.S.A. 17B:32B-6b.
All assessed HMOs, in turn, comprise the New Jersey Insolvent Health Maintenance Organization Assistance Association ("HMO Association") which the Act establishes as a tax exempt, not-for-profit entity whose members are required to remain in the Association in order to retain authority to transact business in New Jersey. N.J.S.A. 17B:32B-5. The HMO Association *392 operates through a Board of Directors ("Board"), who are representatives of and chosen by the member HMOs, and who, in turn, operate pursuant to a plan which provides for the administration of the HMO Fund as well as for the orderly cessation of business upon the depletion of monies in the HMO Fund. N.J.S.A. 17B:32B7a, -10a, and -10e.
The Board assesses each HMO member part of the aggregate amount which, as noted, may not exceed $50,000,000. Assessments are proportionate to the "net written premiums received on health maintenance organization business ..." N.J.S.A. 17B:32B-9c. However, net written premiums paid to enrolled Medicaid recipients in a Medicaid-contracting HMO are not used in calculating any assessment of a member HMO. Id.
The assessment of a member HMO shall be exempted, abated or deferred, in whole or in part, if, in the opinion of the Commissioner of Banking and Insurance ("Commissioner"), "payment of the assessment would endanger the ability of the member organization to fulfill its contractual obligations or place the member organization in an unsafe or unsound financial condition." N.J.S.A. 17B:32B-9e. If the assessment of a member organization is abated, exempted or deferred, that assessment shall be distributed proportionately to the other member organizations. Id.
A member HMO may not pass through its assessment through premium rates unless approved by the Commissioner. N.J.S.A. 17B:32B-9h. The Commissioner may approve inclusion of the assessment amount in a member HMO's premium rates if it is determined, after a separate filing by the member, "that exclusion of those assessments in determining its schedule of charges or rates will significantly and adversely affect the organization." Id.
A member HMO, however, may offset any assessment made against its corporation business tax liability by not more than 10% of the amount of the assessment for each of the five calendar years following the second year after the year in which the assessment was paid, except that no HMO may offset more than 20% of its corporate tax liability in any one year. N.J.S.A. 17B:32B-12a. In addition, if there is a surplus, money that is available from the fund "shall be used to make pro rata refunds to member organizations and the State ..." N.J.S.A. 17B:32B-10f and 12a.
Only those claims where a contractual obligation existed either to individuals who were enrollees of HIP or APPP or to providers of health care services to HIP or APPP enrollees will be considered for payment through the HMO Fund. To receive payment for a claim from the HMO Fund, the provider must "agree to forgive that organization one-third of the unpaid contractual obligation incurred prior to insolvency, which would otherwise be paid by the organization had it not been insolvent." N.J.S.A. 17B:32b-15. All claims shall be "adjudicated in accordance with standard industry practice, subject to available documentation and information." N.J.S.A. 17B:32B-8g. If the Commissioner should determine that an audit is necessary, the HMO Association will employ a consulting organization "to audit the adjudicated claims of the insolvent organization payable by the [A]ssociation ... to determine whether they have been adjudicated in accordance with [standard industry practice]" at a cost not to exceed $2,000,000, collectable through additional assessments upon the member HMOs. N.J.S.A. 17B:32b-8h(1), (3).
Plaintiff in this matter is the New Jersey Association of Health Plans (NJAHP), the nonprofit lobbyist for its nine member HMOs challenging the constitutionality of *393 the Act. Its Complaint seeks injunctive and declaratory relief adjudicating the Act facially violative of the New Jersey and United States Constitutions in five respects. First, plaintiff contends that the assessment and prohibition against passthrough of the assessment constitute an unconstitutional taking because there is no guarantee of a reasonable rate of return. Second, plaintiff argues the Act violates substantive due process because the assessment fails to rationally relate to a legitimate governmental purpose; unreasonably deprives its members of their right to a fair rate of return or to withdraw from the market in time to avoid the monetary assessment; and arbitrarily imposes an assessment amount without benefit of a regulatory audit or independent verification of the aggregate debt of the insolvent HMOs. Third, plaintiff posits that the Act violates equal protection by discriminating against member HMOs and thereby placing them at a competitive disadvantage with competing health insurers not subject to this assessment, for no apparent public purpose. Fourth, plaintiff alleges the Act unconstitutionally impairs its members' contractual rights and lastly, that it is a punitive measure, constituting an impermissible bill of attainder. As noted, these claims are all facial challenges.
Defendant State of New Jersey has filed a pre-answer motion to dismiss pursuant to R. 4:6-2(e) maintaining that each of plaintiff's constitutional challenges to the Act fails, as a matter of law, to state a claim upon which relief could be granted.

FAILURE TO STATE A CLAIM STANDARD
In deciding a motion to dismiss for failure to state a claim upon which relief can be granted under R. 4:6-2(e), "the inquiry is confined to a consideration of the legal sufficiency of the alleged facts apparent on the face of the challenged claim." Rieder v. State, Dep't. of Transp., 221 N.J.Super. 547, 552, 535 A.2d 512 (App.Div.1987) (quoting P. & J. Auto Body v. Miller, 72 N.J.Super. 207, 211, 178 A.2d 237 (App.Div.1962)). For purposes of determining the motion, "all facts alleged in the complaint and legitimate inferences drawn therefrom are deemed admitted." Ibid. A reviewing court "searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989). If, however, the allegations are "palpably insufficient to support a claim upon which relief can be granted," the court must dismiss the complaint. Rieder, supra, 221 N.J.Super. at 552, 535 A.2d 512.

THE PRESUMPTION OF VALIDITY
A review of several basic principles will lay the groundwork for resolving defendants' motion to dismiss plaintiff's facial constitutional claims. First and foremost, there is a strong presumption in favor of the constitutionality of a statute. State Farm Mut. Auto. Ins. Co. v. State, 124 N.J. 32, 45-46, 590 A.2d 191 (1991); Paul Kimball Hosp. v. Brick Tp. Hosp., 86 N.J. 429, 447, 432 A.2d 36 (1981); Reingold v. Harper, 6 N.J. 182, 192-93, 78 A.2d 54 (1951). While the presumption may be rebutted, the affirmative burden placed upon a party attacking the constitutionality of a statute is a heavy one. State Farm Mut. Auto Ins. Co., supra at 45-46, 590 A.2d 191; Velmohos v. Maren Eng. Corp., 83 N.J. 282, 416 A.2d 372 (1980); Reingold v. Harper, supra at 192-93, 78 A.2d 54. The presumption is that the Legislature intended to act constitutionally when *394 it enacted the statute, Right to Choose v. Byrne, 91 N.J. 287, 311, 450 A.2d 925 (1982); that it acted wholly within its allotted sphere, Reingold v. Harper, supra at 192-93, 78 A.2d 54; and from adequate factual support. Hutton Park Gardens v. Town Council of West Orange, 68 N.J. 543, 350 A.2d 1 (1975). The presumption is not overcome and a legislative enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt, Paul Kimball Hosp. v. Brick Tp. Hosp., supra at 447, 432 A.2d 36; Brunetti v. Borough of New Milford, 68 N.J. 576, 599, 350 A.2d 19 (1975); Harvey v. Essex County Board of Freeholders, 30 N.J. 381, 153 A.2d 10 (1959); English v. Newark Housing Authority, 138 N.J.Super. 425, 431, 351 A.2d 368 (App.Div.), Toms River Affiliates v. Dep't of Environ. Protection, 140 N.J.Super. 135, 143, 355 A.2d 679 (App.Div.), cert. denied 71 N.J. 345, 364 A.2d 1077 (1976), or the statute plainly exceeds the constitutional power of the Legislature. Yellow Cab Co. of Camden v. State, 126 N.J.Super. 81, 312 A.2d 870 (App.Div.1973). Indeed, courts exercise the power to declare a statute unconstitutional sparingly. "To declare a legislative act unconstitutional is a judicial power to be delicately exercised." WHYY, Inc. v. Glassboro, 50 N.J. 6, 13, 231 A.2d 608 (1967).
This presumption of validity is particularly strong in the realm of economic legislation "adjusting the benefits and burdens of economic life." See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Courts have repeatedly stated that they will not sit as a "superlegislature," and that it is not the function of the courts to evaluate the efficacy or wisdom of a particular legislative enactment. In re American Reliance Ins. Co., 251 N.J.Super. 541, 549, 598 A.2d 1219 (App.Div.1991), certif. denied, 127 N.J. 556, 606 A.2d 369 (1992); see also, Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) (noting that "[u]nder the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation."). Thus, economic legislation neither warrants nor permits close scrutiny. Rather, the court's proper role is to defer to the legislative judgment "as to the necessity and reasonableness of a particular measure." Edgewater Investment Associates v. Borough of Edgewater, 103 N.J. 227, 235, 510 A.2d 1178 (1986) (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 22-23, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). Moreover, in evaluating a statute, a court cannot re-evaluate a problem that the legislature already considered or substitute its judgment for the legislature's judgment. Henderson v. Sea-Land Service, Inc., 192 N.J.Super. 1, 12, 468 A.2d 1064 (Law Div.1983); A & B Auto Stores of Jones St., Inc. v. City of Newark, 59 N.J. 5, 279 A.2d 693 (1971). And the legislative choice is not subject to courtroom factfinding. Federal Communications Comm'n v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).
These well-settled principles are "particularly compelling in the context of a challenge to the facial constitutionality of legislation." In re American Reliance Ins. Co., 251 N.J.Super. 541, 550, 598 A.2d 1219 (App.Div.1991) (upholding constitutionality of statute requiring casualty and property insurance companies to contribute to a fund that would bail out automobile insurers); see also, State Farm, supra, 124 N.J. at 46, 590 A.2d 191. When examining a facial challenge to legislation, "the effects [of the statute] on particular participants in an industry are not dispositive; *395 rather, the question is whether the `mere enactment' of a statute offends constitutional rights." State Farm, supra, 124 N.J. at 46, 590 A.2d 191. Holding a statute facially unconstitutional is "exceedingly rare." Id. "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." United States v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916); see also, Rust v. Sullivan, 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed. 2d 233 (1991). Thus, where a statute is capable of two constructions, one of which would render it unconstitutional and the other valid, that which will uphold its validity must be adopted by the reviewing court. Ahto v. Weaver, 39 N.J. 418, 428, 189 A.2d 27 (1963).
Measured against basic canons of statutory construction, plaintiff's facial constitutional challenges must all fail.

THE ACT DOES NOT CONSTITUTE AN UNCONSTITUTIONAL TAKING OF PLAINTIFF'S PROPERTY
Plaintiff argues that the assessments in issue result in an unconstitutional confiscatory taking. Defendants concede that if the statute operates to affirmatively preclude plaintiff's members from realizing a fair and reasonable rate of return on their investment, it would raise serious constitutional issues, a conclusion mandated by our Supreme Court's decision in State Farm Mut. Auto. Ins. Co. v. State of New Jersey, 124 N.J. 32, 590 A.2d 191 (1991). Defendants maintain, however, that the statutory and regulatory framework for rate adjustment, when considered as a whole, afford plaintiff's members an effective means of relief from any confiscatory assessment so that the challenged provisions do not, on their face, necessarily deprive them of a fair and reasonable rate of return on their investment.
The Fifth and Fourteenth Amendments to the United States Constitution prohibit the taking of private property "for public use without just compensation." U.S. Const.amends. V and XIV. The New Jersey Constitution likewise provides that private property "shall not be taken for public use without just compensation." N.J. Const.art. 1, par. 20. New Jersey courts have interpreted this provision similarly to the federal provision. See Spiegle v. Borough of Beach Haven, 46 N.J. 479, 489-493, 218 A.2d 129, cert. denied 385 U.S. 831, 87 S.Ct. 63, 17 L.Ed.2d 64 (1966).
Any tax is a "taking" in a literal sense, but a bona fide revenue-raising measure is not a "taking" in a constitutional sense. Cf. Houck v. Little River Drainage Dist., 239 U.S. 254, 265, 36 S.Ct. 58, 60 L.Ed. 266 (1915) ("[T]he power of taxation should not be confused with the power of eminent domain. Each is governed by its own principles.") Traditionally, courts apply far less scrutiny when the alleged taking does not include a physical taking or invasion of real property. See Yee v. City of Escondido, 503 U.S. 519, 522, 528, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Generally, courts hesitate to require compensation in regulatory "takings" cases. See In re Plan for Orderly Withdrawal, 129 N.J. 389, 416, 609 A.2d 1248 (1992), cert. denied 506 U.S. 1086, 113 S.Ct. 1066, 122 L.Ed.2d 370 (1993).
State and federal Constitutions are concerned not so much with the way in which the initial rates are set as with whether the rates as finally set are confiscatory. Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944). This is because in a regulated industry, confiscatory *396 rate regulations would be an unconstitutional "taking." See Duquesne Light Co. v. Barasch, 488 U.S. 299, 308-310, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). On this score, it is settled that whether a regulation produces a return that is confiscatory or fair depends on the result and a regulation will be invalidated on its face only if its terms preclude avoidance of confiscatory results. Fisher v. City of Berkeley, 37 Cal.3d 644, 683, 209 Cal.Rptr. 682, 693 P.2d 261 (1984). In other words, petitioners must show that the law is "so restrictive as to facially preclude any possibility of a just and reasonable return," Hutton Park Gardens v. Town Council of West Orange, 68 N.J. 543, 350 A.2d 1 (1975); that the "new burdens on the insurers ... necessarily preclude a fair rate of return," State Farm Mut. Auto. Ins. Co. v. State of New Jersey, supra, 124 N.J. at 51, 590 A.2d 191 ("State Farm"); that "its terms will not permit those who administer it to avoid confiscatory results." Birkenfeld v. City of Berkeley, 17 Cal.3d 129, 165, 130 Cal.Rptr. 465, 550 P.2d 1001 (1976).
This is the standard established by our Supreme Court in State Farm in upholding the constitutionality of the assessments imposed by the Fair Automobile Insurance Reform Act of 1990 ("Fair Act"), N.J.S.A. 17:33B-1 et seq., against challenges of confiscatory taking. The Fair Act imposed assessments and surtaxes on auto insurers in order to pay for the $3.3 billion debt accumulated by the New Jersey Automobile Full Insurance Underwriting Association ("JUA") from 1983 to 1990. The Fair Act required auto insurers to pay a 5% surtax and a 2.7% assessment on premiums and prevented these charges from being included in rates. Specifically, the Fair Act explicitly provided that "[n]o member insurer shall impose a surcharge on the premiums of any policy to recoup assessments paid ...," N.J.S.A. 17:30A-16b, and that "[t]he Commissioner of Insurance shall take such action as is necessary to ensure that private passenger automobile insurance policyholders shall not pay for the surtax imposed." N.J.S.A. 17:33B-51.
The auto insurance carriers argued that the charges, in combination with the absolute prohibition against pass-through of the assessment to policyholders via a surcharge, would inevitably result in substantial loss of income to the insurers, cause them to operate at a net loss and deprive them of a constitutionally adequate rate of return. 124 N.J. at 46, 590 A.2d 191. In examining the "confiscatory takings" argument, the Court enunciated the standard of review: "[T]he validity of rate setting under the takings clause should include scrutiny of `what is a fair rate of return given the risks under a particular rate setting system and ... the amount of capital upon which the investors are entitled to earn that return.' " Id. at 48, 590 A.2d 191. In other words, to avoid confiscatory results under the takings clause, " `the return should be one which is generally commensurate with returns on investments in other enterprises having comparable risks.' " Id. at 48, 590 A.2d 191 (quoting Hutton Park Gardens v. Town Council, supra, 68 N.J. at 570, 350 A.2d 1). While acknowledging that a participant in a regulated industry is "entitled to something more than survival," State Farm, supra, 124 N.J. at 48, 590 A.2d 191, the Court nevertheless concluded:
[T]he constitutional requirement that a business be permitted a return sufficient to assure its financial health does not necessarily require any particular level of profit above what is adequate to attract and retain invested capital .... [A] constitutionally "fair" rate of return may well involve a sacrifice of an untrammeled opportunity for profits on the part of the regulated business. "The rate of *397 return permitted need not be as high as prevailed in the industry prior to regulation nor as much as an investor might obtain by placing his capital elsewhere."... In particular, government price controls do not have to allow passthroughs of particular cost increases in order to assure a constitutionally adequate rate of return.

[State Farm, supra, 124 N.J. at 48-49, 590 A.2d 191 (quoting Hutton Park Gardens, supra, 68 N.J. at 570, 350 A.2d 1) (emphasis added)].
In determining whether the financial burdens imposed on the auto insurers by the Fair Act "necessarily preclude a fair rate of return," Id. at 51, 590 A. 2d 191, the Court stated the inquiry thusly:
[T]hat determination requires the resolution of two questionsfirst, [does the statute] absolutely bar cost passthroughs to offset the impact of the assessments...; and second, if one or both of those new costs cannot be recovered through standard rate relief, does the Reform [FAIR] Act nonetheless permit the Commissioner otherwise to set rates that would provide a fair rate of return.

[Ibid.]
Thus, whether, on the one hand, government has validly exercised its police power to regulate or, on the other, extracted a confiscatory taking must be assessed in light of the regulatory scheme as a whole and not judged by a singular component thereof. Namely, "government price controls do not have to allow passthroughs of particular cost increases in order to assure a constitutionally adequate rate of return." Id. at 49, 590 A.2d 191 (citing FPC v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974)). Instead, the Court in State Farm, supra, in viewing the totality of the Fair Act and implementing regulations, considered its cost-saving provisions and found that while these might "not individually or collectively assure a fair rate of return for insurers ... they do increase the possibility of avoiding confiscatory rates." Id. at 55, 590 A.2d 191. The Court also relied on regulations authorizing insurers to make special filings requesting rate relief when an insurer is unable to receive a constitutionally fair rate of return due to the surtax or assessment. Moreover, these regulations were found to be consistent with the legislative intent expressed in N.J.S.A. 17:33B-2g that "automobile insurers are entitled to earn an adequate rate of return through the ratemaking process." And, as with any facial challenge, the Court construed the Fair Act so as to avoid the conclusion that it is unconstitutional:
The statute should be liberally construed as giving the Commissioner ample authority to follow that directive and achieve the legislative objective. See Allendale Field and Stream Ass'n v. Legalized Games of Chance Control Comm'n, 41 N.J. 209, 195 A.2d 620 (1963) ("[w]e should liberally construe the [statute] to permit the agency to achieve the task assigned to it, and should imply, if need be, incidental powers reasonably adapted to that end."). The sensible integration and application of Sections 2g, 75, and 78 have been committed by the Legislature to the discretion of the Commissioner of Insurance.
[State Farm, supra, 124 N.J. at 54, 590 A.2d 191].
Thus, in rejecting the insurers' facial attack, the Court considered the regulatory scheme as a whole and found ample relief therein if the assessment proves confiscatory:
Nonetheless, the Legislature's assurance of an adequate rate of return under Section 2g and the creation of a special *398 rate-relief process under N.J.A.C. 11:3-16.11 demonstrate that the prohibitions of Sections 75 and 78 do not necessarily preclude all insurers from earning a fair rate of return.
[Id. at 61-62, 590 A.2d 191].[1]
Having determined that the Fair Act does not preclude adjustments necessary to achieve the constitutional standard of fair and reasonable rates, the Court in State Farm, supra, relegated the insurers to as-applied proceedings:
[I]t will be appropriate for the Commissioner to render determinations on individual insurers' rate-increase applications in the first instance, before challenges to the constitutionality of the application of the statute and regulations are brought.... [A]ffected insurers are free to institute as-applied challenges to the [FAIR] Act in the event that the relief afforded to them under [the rate increase application process] is either substantively or procedurally inadequate to assure a constitutionally fair rate of return.
[State Farm, supra, 124 N.J. at 63, 590 A.2d 191].[2]
As State Farm clearly demonstrates, courts will scrutinize for provisions that will "moderate and mitigate" the effects of the government's action. Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 225-26, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Consequently, courts focus less on the rate specified in the statute than on the ability of the insurer to obtain relief if that rate proves confiscatory. This is because "the face of a statute rarely reveals whether the rates it specifies are confiscatory or arbitrary, but necessarily discloses its provisions, if any, for rate adjustment." Calfarm Insurance *399 Co. v. Deukmejian, 48 Cal.3d 805, 258 Cal.Rptr. 161, 771 P.2d 1247, 1252-53 (1989). Recognizing that virtually any law which sets prices may prove confiscatory in practice, courts have carefully scrutinized such provisions to ensure that the insurers will have an adequate remedy for relief from confiscatory rates.
Applying these principles to the assessment at issue in this case, when the Act is read in its entirety, the remaining provisions afford HMO insurers an effective means of relief from any confiscatory rate. First, if payment of the assessment places the HMO in an "unsafe or unsound financial condition" or would endanger the HMO's ability to fulfill its contractual obligations, the HMO may request an exemption, abatement or deferral. N.J.S.A. 17B:32B-9(e). Second, the Commissioner may permit a passthrough of the assessment in setting an HMO's rate schedule if failing to do so will "significantly and adversely" affect the HMO. N.J.S.A. 17B:32B-9(h). Third, HMOs are allowed to take a credit against their corporation business tax liability of 50% of any assessment, spread equally over five years, subject to a maximum annual credit equal to 20% of corporate tax liability. N.J.S.A. 17B:32B-21. Fourth, pro rata refunds shall be made to member HMOs if additional monies become available to the estates of HIP and APPP. N.J.S.A. 17B:32B-10(f). In view of these safeguards, either individually or collectively considered, the Act does not, on its face, necessarily preclude HMO insurers from realizing a fair and reasonable rate of return on their investment.
Plaintiff nevertheless insists that these so-called "safety valves" afford insufficient protection. It points primarily to the lack of express statutory language requiring the Commissioner to exempt an HMO from an assessment, or to allow its passthrough in the HMO's rate or charging schedule, where payment of the assessment would preclude the HMO from earning a reasonable rate of return. Instead, the statutory language permits exemption only in the face of threatened insolvency and allows passthrough only where a "significant and adverse" effect has been otherwise demonstrated. Plaintiff argues these elevated standards fail to guarantee HMO insurers a reasonable rate of return.
In the first place, plaintiff misstates the standard which is whether its member HMO insurers are able to demonstrate that they will inevitably be precluded from earning a reasonable rate of return when considering the regulatory scheme as a wholeof which the assessment in issue is only one component. Of course, plaintiff makes no such showing. But even assuming plaintiff correctly states the standard, it has grossly misread the import of the Act which permits HMO insurers to earn a constitutionally adequate rate of return.
To be sure, even under the most generous interpretation, "insolvency" may not be construed to conform to the constitutional standard of a "fair and reasonable rate of return." However, the qualification limiting exemptions to HMO insurers substantially threatened with insolvency does not likewise limit the statutory relief from the passthrough prohibition available where the assessment would otherwise "significantly and adversely" affect the HMO's financial condition. In other words, the "insolvency" standard under which exemptions are measured leaves untouched the much less exacting standard for relief against assessments set out in Section 9(h) (N.J.S.A. 17B:32B-9(h)), governing passthroughs generally. Far less burdensome than the "insolvency" threshold, the "significant and adverse impact" standard is clearly distinguished from the Fair Act's absolute prohibition against *400 passthroughs which the State Farm Court nevertheless found not to have necessarily precluded the auto insures from achieving a fair rate of return. If the absolute passthrough prohibition in the Fair Act had no such effect, then the statutory allowance for passthroughs in the (HMO) Act, a fortiori, passes constitutional muster.
This is also because the "significant and adverse impact" standard reasonably may be equated with the "fair rate of return" standard, or at the very least any distinction between the two measures is not constitutionally significant. In determining whether an assessment will significantly and adversely effect an HMO's financial condition, consideration must necessarily be given to the impact of that assessment on the HMO's rate of return. Surely, if an HMO cannot earn an adequate rate of return, it would, by definition, not be able to retain capital, much less attract new capital, in which event the HMO will experience a significant and adverse financial effect. Statutory safeguards protecting against such a "significant and adverse effect" necessarily protect an HMO's reasonable rate of return. At the very least, this safety valve "increases the possibility of avoiding a confiscatory rate," State Farm, supra, 124 N.J. at 55, 590 A.2d 191, and at the very most, assures a fair rate of return. Thus, we construe the Act's "significant and adverse impact" standard as evidencing a "legislative recognition of the State's overarching constitutional obligation to assure all [HMO] insurers a reasonable rate of return." American Reliance, supra, 251 N.J.Super. at 556, 598 A.2d 1219.
This construction not only avoids possible constitutional questions, it is entirely plausible and consistent with the implementing agency's own interpretation of the Act. Above all, our reading of the statutory standard is what the government itself has put forward in this litigation and what it must adhere to in the future. Furthermore, the Commissioner has given fair notice of the agency's regulatory interpretationalbeit advanced for the first time in this litigationthrough her drafting of the following proposed regulation governing subsection 9(h) of the Act as authorized by N.J.S.A. 17B:32B-17:
The Commissioner shall find that the exclusion of assessments in determining the member organization's schedule of charges or rates will significantly and adversely affect the organization if: (1) The member organization demonstrates that it is unable to earn an adequate rate of return after paying the assessment.

[N.J.A.C. 11:4-1.9].
As the proposed regulation makes abundantly clear, not only is the prohibition against passthrough in the Act not absolute, but must be relaxed where otherwise it would prevent the HMO from earning an adequate rate of return. The agency's own equation of "significant and adverse impact" with "fair and reasonable rate of return" is an interpretation upon which HMO entities whose behavior is being regulated are entitled to rely, Cox v. Louisiana, 379 U.S. 559, 568-69, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) and to which the court may properly defer. Stated somewhat differently, if the government is willing to disclaim use of any standard more exacting than the "fair and reasonable rate of return" yardstick, we see no reason to insist otherwise. Accordingly, in light of the possible constitutional difficulties entailed by reading into Subsection 9(h) a more burdensome standard than that suggested by the government, we adopt its interpretation. We are, quite simply, reluctant to find more burdensome requirements than the government eschews any intention to impose.
*401 Any doubt as to the reasonableness of this construction is dispelled by reference to the HMO rate filing statutes, N.J.S.A. 26:2J-8(b) and N.J.S.A. 26:2J-4.3(e), which require fair rates and which must be read in pari materia with the Act in question here. Brown v. Township of Old Bridge, 319 N.J.Super. 476, 498, 725 A.2d 1154 (App.Div.1999). The HMO rate filing statutes employ the traditional standard that rates shall not be "excessive, inadequate or unfairly discriminatory"language which makes clear that the Commissioner can grant relief from confiscatory rates. See Calfarm Insurance Co. v. Deukmejian, supra, 258 Cal.Rptr. 161, 771 P.2d at 1253.[3] This prohibition on excessive or inadequate rates echoes similar language in the laws of most states. Id. at 1256. It seems self-evident that a "confiscatory" rate is an "inadequate" rate and no one has argued otherwise. Since a confiscatory rate is necessarily an "inadequate" rate under the statutory language, the HMO rate filing statutes require rates within that range "which can be described as fair and reasonable and prohibit approval or maintenance of confiscatory rates." Id. at 1257.
In summary, the HMO rate setting process, "evidences a legislative recognition of the State's overarching constitutional obligation to assure all insurers a reasonable rate of return." American Reliance, supra at 556, 598 A.2d 1219. So construed, the Act's assessment and passthrough prohibition, when viewed in the larger context of the regulatory scheme as a whole, do not necessarily preclude HMO insurers from earning a fair rate of return on their capital investment. On the contrary, the Act's explicit safeguards, including relief upon a demonstration that the passthrough prohibition, as applied, results in a confiscatory rate, meet constitutional standards. Thus, the Act is constitutional on its face because it does not mandate confiscatory assessments. The first count of plaintiff's complaint is therefore dismissed with prejudice.

THE ACT DOES NOT VIOLATE PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS
Plaintiff next contends the Act, on its face, violates its members' substantive due process rights. Woven into its due process argument are essentially four claims, one of which has already been rejected and that is that Subsections 9(e) and 9(h) of the Act preclude adjustments necessary to achieve the constitutional standard of a fair rate of return. Plaintiff also argues the Act is unreasonable, arbitrary and capricious in at least three other respects, namely: (1) preclusion from withdrawal from the market in time to avoid *402 the Act's monetary assessment; (2) the absence of an independent regulatory audit or accounting to verify the aggregate debt of the insolvent HMOs; and (3) failure to account for the $30 million payment to providers for services rendered before the State take-over of HIP. Each of these claims will be addressed after we deal first with plaintiff's primary gripe that the Act's sole purpose is to protect selected creditors of the insolvent HMOs and, as such, fails to rationally or reasonably relate to a legitimate governmental purpose.
It is well settled that the guarantee of substantive due process requires only that the legislation not be unreasonable, arbitrary or capricious and that the means selected to achieve the governmental objectives bear a rational relationship to these objectives. In re Plan for Orderly Withdrawal from New Jersey of Twin City Fire Ins. Co., 129 N.J. 389, 406, 609 A.2d 1248 (1992); Greenberg v. Kimmelman, 99 N.J. 552, 563, 494 A.2d 294 (1985); Joseph H. Reinfeld, Inc. v. Schieffelin & Co., 94 N.J. 400, 412, 466 A.2d 563 (1983); Robson v. Rodriquez, 26 N.J. 517, 522, 141 A.2d 1 (1958). If a statute does not affect a fundamental right, and is supported by a conceivable rational basis, it will withstand a substantive due process challenge. American Reliance, supra, 251 N.J.Super. at 552, 598 A.2d 1219, citing Greenberg v. Kimmelman, supra at 563, 494 A.2d 294; Ocean Pines Ltd. v. Borough of Point Pleasant, 112 N.J. 1, 10, 547 A.2d 691 (1988); Taxpayers Ass'n of Weymouth Township v. Weymouth Township, 80 N.J. 6, 364 A.2d 1016 (1976), appeal dism'd sub.nom. Feldman v. Weymouth Township, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977). In other words, "[e]ven if a court cannot ascertain the actual purpose of the statute, it should sustain the statute if it has any conceivable rational purpose." Auge v. New Jersey Dep't. of Corrections, 327 N.J.Super. 256, 266, 743 A.2d 315 (App.Div.2000); see In re C.V.S. Pharmacy Wayne, 116 N.J. 490, 498, 561 A.2d 1160 (1989), cert. denied 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990); see also, Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Stated somewhat differently, petitioners must "negative every conceivable basis which might support [the legislative arrangement]." Madden v. Kentucky, 309 U.S. 83, 88, 60 S.Ct. 406, 84 L.Ed. 590 (1940).
As a general proposition, "[as to] the legitimacy and reasonableness of legislation, courts generally defer to legislative judgment ..." In re PSE & G Company's Rate Unbundling, 330 N.J.Super. 65, 94, 748 A.2d 1161 (App.Div.2000). Moreover, a statute need not be the best or only method of achieving a legitimate legislative goal, nor does the statute have to reflect mathematical precision, in order to withstand judicial scrutiny. In re C.V.S. Pharmacy Wayne, supra, 116 N.J. at 498, 561 A.2d 1160. "[A] legislative choice is not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data." Federal Communications Comm'n v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).
Governed by these standards, the Act withstands plaintiff's facial substantive due process attack. The Act addresses a legitimate, indeed significant, public purpose through selected means reasonably related to achieving this end.
Here, the legislative purpose is clearly ascertainable. The stated purpose is "to protect, subject to certain limitations, covered individuals and providers against the failure or inability of [HIP] and [APPP] to perform certain contractual obligations due to their insolvency." N.J.S.A. *403 17B:32B-2. Namely, the Act's import is to protect providers and enrollees who suffered significant losses in the wake of the two HMO insolvencies; to aid in the continued financial stability of the medical providers who otherwise would be forced to absorb the full amount of these losses; and thereby to ensure the ready and ongoing availability of reliable health care services at a reasonable cost. In this regard, it was entirely reasonable for the Legislature to assume that the magnitude of the insolvencies at hand might compromise the fiscal health of the many hospitals and health care providers servicing the insureds of these two failed organizations who were owed substantial monies therefrom and therefore jeopardize their continued provision of health care to the remaining HMOs operating in this State at a reasonable cost.
From this rational assumption, it was entirely reasonable for the Legislature to conclude that by ensuring partial reimbursement to these providers for services rendered in good faith, the likelihood is substantially increased that they will continue to provide reliable medical services to insureds of other HMOs without the need to pass on their financial losses in higher fees and charges. By the same token, it is indeed conceivable that by alleviating the financial pressures stemming from the insolvencies of two HMOs, the Legislature reasonably acted to restore public and provider confidence in the health care system in this State, so vital to the continued success of HMOs in general.
Having identified a vital public interest in ensuring that hospitals and other health care providers remain able to provide ongoing and reliable health care services in this State, the Legislature reasonably chose to use an established method for dealing with the undisputed financial effects of the HMOs' insolvencies. The means selecteda guaranty fund composed, in part, of assessments on those operating HMOs based on the amount of premiums earned in New Jerseyis a reasonable and rational means of attaining the legislated end that the burden of mitigating the outstanding debt accrued by the two insolvent HMOs be placed on those who benefit most from the continuation of the HMO industry.
As noted, the use of a guarantee fund to ease the adverse financial effects of the HIP and APPP insolvencies is a timetested revenue-raising mechanism that follows a long tradition in this State of dedicating such monies to meet the obligations of insolvent insurers. See N.J.S.A. 17:30A-1 et seq. (Property Liability Insurance Guaranty Association [PLIGA]); N.J.S.A. 17:22-6.70 et seq. (Surplus Lines Insurance Guaranty Fund); N.J.S.A. 17:30B-1 et seq. (Special Joint Underwriting Association); N.J.S.A. 17B:32A-2 et seq. (Life and Health Insurance Guaranty Association). Similar to the HMO Insolvency Fund created under the Act, these other statutory guaranty funds receive assessments from solvent companies in order to address fiscal crises in their own industry. Their creation is a direct function of the State's power to regulate to protect the public from economic harm. See Lane Distributors, Inc. v. Tilton, 7 N.J. 349, 362, 365-66, 81 A.2d 786 (1951); see also, State v. New Jersey Trade Waste Association, 191 N.J.Super. 144, 151, 465 A.2d 596 (Law Div.1983).
In American Reliance, supra, our Appellate Division addressed due process challenges to the assessments upon all PLIGA members under the Fair Act, including even those property and casualty mutual insurance carriers who were not authorized to write automobile insurance in this State. The court flatly rejected the facial constitutional attack, reasoning that *404 the imposition of assessments on all PLIGA members represented a "reasonable method of achieving an appropriate governmental objective," namely to raise revenue to fund the JUA deficit. 251 N.J.Super. at 553, 598 A.2d 1219. Likewise here, the statutory tripartite approach to the reasonably perceived problem of availability of ongoing, reliable health care services at a fair cost has a "real and substantial relation to the object sought to be obtained." State Farm v. State, supra, 124 N.J. at 63, 590 A.2d 191, quoting Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934).
Given a rational basis for imposing assessments on HMOs operating in New Jersey, we reject summarily plaintiff's other argument that the Act is constitutionally infirm because HMOs may not withdraw from the market in time to avoid the Act's financial burden. It is by now well-settled that the public has an interest in maintaining a stable insurance market. American Reliance, supra, 251 N.J.Super. at 554, 598 A.2d 1219; In re Plan for Orderly Withdrawal, supra, 129 N.J. at 417-418, 609 A.2d 1248. Compounding the financial pressures generated by two failed HMOs, it was reasonable for the Legislature to conclude that the departure of solvent HMO's from New Jersey's health care system conceivably could further destabilize the market and pose an additional threat to the continued availability of medical services at reasonable cost. The situation presented supports and enhances the reasonableness of, and necessity for, the statutory measure here at issue to promote market stability.
Plaintiff's next pointthat the Fund will be used to pay unadjusted claimsmay be dismissed with equal dispatch. This is simply not what the statute provides. Rather, N.J.S.A. 17B:32B-8g provides that claims "shall be adjudicated in accordance with standard industry practice," and sets forth specific minimum guidelines to ensure that only eligible, non-duplicative claims are paid. While the statute provides for an interim distribution to providers, which may occur prior to the final adjudication of the claims, N.J.S.A. 17B:32B-9b also requires that any provider receiving an interim distribution from the Fund must refund any monies subsequently determined to be overpaid. Further, N.J.S.A. 17B:32B-9h allows for an audit of the adjudicated claims at the discretion of the Commissioner. Finally, because both the HIP and APPP liquidation estates are subject to the Life and Health Insurers Rehabilitation and Liquidation Act, N.J.S.A. 17B:32-31 et seq., there will be court review of all notices of determination for the provider claims pursuant to the procedure set forth at N.J.S.A. 17B:32-68. This provides yet another safeguard against overpayment of claims.
Finally, plaintiff complains that the Court-approved rehabilitation plan which gave HIP providers a sum equal to 30% of their pre-rehabilitation claims upon their agreement to continue providing services for HIP members and to receive only 75% of their contract rate for reimbursement during the rehabilitation period defeats this legislative scheme. The Act, however, addresses only pre-rehabilitation claims, N.J.S.A. 17B:32B-2, and not expenses incurred to administer the insolvent estates during their respective rehabilitation periods. The 30% payment, which was specifically approved by the liquidation court as part of the rehabilitation plan, was an incentive to continue health care services and thus properly considered an administrative expense of the HIP estate. N.J.S.A. 17B:32-71(a)(1). So viewed, plaintiff's complaint about the $30 million payment is wholly without merit.
*405 There is no real dispute here but that the assessments at issue were imposed pursuant to a revenue-raising measure intended to meet a need for which the State is authorized to raise and spend public money. Since the means selected further a legitimate governmental goal, the Act, on its face, does not violate member HMOs' substantive due process rights. Accordingly, the second count of plaintiff's complaint will be dismissed with prejudice.

THE ACT DOES NOT VIOLATE PLAINTIFF'S EQUAL PROTECTION RIGHTS
Plaintiff argues that by treating HMOs differently than other health insurers operating in this State, and singling them out for assessments into the Fund, the Act discriminates against its members without rational basis, in violation of their equal protection rights. Under the substantive due process challenge, we have already determined there is a rational basis for the imposition of assessments. The question raised here is whether the legislative classification is similarly rationally based.
Essentially, the equal protection clause requires some rationality in the nature of the class singled out. Rinaldi v. Yeager, 384 U.S. 305, 309, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966). The legislative body, in the exercise of its powers, may make a classification as it deems necessary. Zullo v. Board of Health, Woodbridge Tp., 9 N.J. 431, 440, 88 A.2d 625 (1952). As long as the classification is based on reasonable grounds so as not to be arbitrary and capricious, courts will not substitute their opinion for the determination of the legislature. Ibid.; Village of Belle Terre v. Boraas, 416 U.S. 1, 8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). Such a classification must be sustained if any set of facts or circumstances may reasonably be conceived to justify it. Paul Kimball Hospital v. Brick Tp. Hosp., supra, 86 N.J. at 441, 432 A.2d 36; Vreeland v. Byrne, 72 N.J. 292, 297, 370 A.2d 825 (1977); Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra, 80 N.J. 6 at 39-40, 364 A.2d 1016.
As with a substantive due process challenge, the burden is on the party attacking the legislation to demonstrate that the classification lacks a rational relationship to the legitimate state objective, where, as here, neither "fundamental" rights nor "suspect" criteria are alleged to be implicated. Id. at 37-40, 364 A.2d 1016. On this score, the Legislature has a large amount of discretion in selecting the means it will employ to accomplish its goals, and distinctions of degree will be presumed to rest upon a rational basis. Robson v. Rodriquez, supra, 26 N.J. at 524, 141 A.2d 1. Distinctions which mark an entity or individual as a member of a particular class may be made "with less than mathematical exactitude." Paul Kimball Hosp., supra at 446, 432 A.2d 36. Such classifications are not defective merely because the legislative objective might have been more fully achieved by a more expansive classification, Robson, supra at 526, 141 A.2d 1, or that it results in some inequities in practice. Taxpayers Ass'n of Weymouth Tp., supra at 40, 364 A.2d 1016. Every classification of persons and things subject to regulation by law of necessity produces inequality in some degree. To violate the constitutional standard, the inequality must be "actually and palpably unreasonable and arbitrary." Guill v. Mayor and Council of City of Hoboken, 21 N.J. 574, 583, 122 A.2d 881 (1956). Stated somewhat differently, the demands of equal protection do not require that government treat all persons or entities identically. What is required is that, where no fundamental *406 rights or suspect criteria are involved, differences in the treatment of persons or entities similarly situated be justified only by an appropriate state interest and the distinctions not be irrational or discriminate invidiously.
We have already determined that the Act's revenue-raising measure is rationally related to the State's legitimate interest in restoring public and provider confidence in the stability of the health care system in general and that of the HMO industry in particular. Further, the means chosen by the Legislature to accomplish this goala tripartite funding mechanismreasonably places the financial burden of assessment on those who, the Legislature rationally concluded, would stand to benefit most from the Act's remedial schemethe providers, the public and the HMO industry. Because the classification is grounded in material differences which are related to the central legislative policy and which are distinctions of circumstance, the class grouping passes constitutional scrutiny.
The selection of HMOs to contribute an equal one-third share to help mitigate the adverse financial consequences of two failed HMOs is not demonstrably arbitrary. On the contrary, all HMOs operating in this State, unquestionably, have a strong interest and stake in the stability of the health insurance market. American Reliance, supra, 251 N.J.Super. at 553, 598 A.2d 1219. More particularly, partial reimbursement of provider claims through assessments funded by the Act's tripartite mechanism conceivably will benefit the providers, the public and the HMO industry by ensuring continued access to health care services at a reasonable cost.
The fact that some members of the burdened class may not directly benefit from the legislative arrangement is insufficient grounds to render the classification arbitrary or unreasonable. American Reliance, supra, 251 N.J.Super. at 553, 598 A.2d 1219. There, the court stated:
The federal and state constitutions do not require a direct correlation between the burden of taxation and the benefits derived from a particular program ... [I]n the area of economic legislation, the Legislature does not violate equal protection or due process "because the classifications made by its laws are imperfect."
[American Reliance, supra, 251 N.J.Super. at 553-54, 598 A.2d 1219 (quoting Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970))].
In American Reliance, property and casualty insurers argued that the burdened class was unconstitutionally "overinclusive" because they had never written automobile insurance and had never been servicing carriers of the JUA and therefore should not be responsible for payment of the JUA debt. 251 N.J.Super. at 553, 598 A.2d 1219. The Court found no violation of their right to equal protection in spreading the financial burden to a wider circle of insurers. Id.
By the same token, claims, such as the one posed here, that the burdened class is "underinclusive" fail for the very same reason. As noted, a classification is not defective because the legislative goal might have been more fully achieved by a more expansive classification, Robson v. Rodriquez, supra at 526, 141 A.2d 1, or that it results in some inequities in practice. Taxpayers' Ass'n of Weymouth Tp., supra. The Legislature may recognize degrees of harm and in devising a remedy it may proceed cautiously step by step. Robson, supra at 526, 141 A.2d 1. Here, in excluding other health insurers from contributing to the Fund, it may be that the Legislature determined that HMOs are more directly affected by insolvencies *407 in their own industry and thus stand to be more directly advantaged by the legislated remedy. In this regard, it is conceivable that the providers who benefit from the Fund also provide ongoing services to many of the other HMOs operating in this State. It is therefore reasonable for the Legislature to conclude that the HMOs' equal one-third contribution to the Fund furthers its objective of mitigating the adverse financial consequences occasioned by the failure of two of its industry's members without enlarging the classification to include all health insurers.
Also, it may well be that the Legislature viewed HMOs and other health insurers as not similarly situated for purposes of being accorded equal treatment. In New Jersey, HMOs must deposit cash or a form of guaranty or security in such amount "as will assure that the obligations to the enrollees will be performed in such amount and for such time as prescribed by the commissioner ..." N.J.S.A. 26:2J-14. Heretofore, HMOs did not contribute to any fund to protect against other member insolvencies. On the other hand, in New Jersey, all non-HMO health insurers must pay two classes of assessments to the New Jersey Life and Health Insurance Guaranty Association to protect providers if a non-HMO health insurer becomes insolvent. N.J.S.A. 17B:32A-8. The fact that non-HMO health insurers historically have been subjected to "bail-out" assessments not applicable to HMOs points to a material distinction between the two and more than amply justifies the selection of the latter now for the legislative assessment in issue.
Thus, whether the matter be considered on due process or equal protection grounds, plaintiff has the heavy burden of demonstrating that the assessment on its member HMOs has no rational basis and bears no real or substantial relationship to a permissible legislative purpose. For all the reasons mentioned, this it has failed to do. Accordingly, the third count of plaintiff's complaint will be dismissed with prejudice.

THE ACT DOES NOT VIOLATE THE CONTRACT CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS
Plaintiff next complains that the Act effects an unconstitutional impairment of contract in violation of art. I, § 10 of the United States Constitution and art. IV, § 7, ¶ 3 of the New Jersey Constitution. Specifically, plaintiff argues that the Act's "no pass-through" provision runs counter to terms of insurance policies that its members HMOs issue, allowing an increase in insurance premium rates upon the policies' periodic renewal. According to plaintiff, the "ability to increase premium rates, guaranteed by these contracts, is essential ... to ensure that HMO[s][are] able to remain solvent and earn a constitutionally fair rate of return ..." (Complaint, ¶ 50). We have already determined that the Act's pass-through prohibition does not deprive plaintiff's member HMOs of a constitutionally fair rate of return, and the very statutory and regulatory safeguards that protect against a confiscatory taking also negate a finding that the Act violates the Contract Clauses of the Federal and State Constitutions. But even more fundamentally, there is no contract guaranteeing a rate increase to plaintiff's members, either between the HMOs and their insureds, or between the HMOs and the State of New Jersey.
As our Supreme Court noted in State Farm, supra, 124 N.J. at 64, 590 A.2d 191, "the legal standards for a violation of the contract clause are strict: the United States Supreme Court has often noted that even though the contract clause sounds definite on its face, it must *408 be applied very flexibly. See, e.g., Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)." As recently stated by the Appellate Division:
The prohibition against impairment of contracts under the federal and state constitutions is not absolute. It must be accommodated to the inherent police power of the states to safeguard the vital interests of their residents. The contract clause does not deprive the states of their power to adopt general regulatory measures even if those regulatory measures result in the impairment or destruction of private contracts.
[In re PSE & G Company"s Rate Unbundling, 330 N.J.Super. 65, 93, 748 A.2d 1161 (App.Div.2000) (citing In re Recycling & Salvage Corp., 246 N.J.Super. 79, 100, 586 A.2d 1300 (App.Div.1991) (quotations omitted))].
In determining whether state legislation offends federal or state constitutional "contract clause" principles, the threshold determination is whether the state law has substantially impaired a contractual relationship. State Farm, supra, 124 N.J. at 64, 590 A.2d 191; Energy Reserves Group v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). If so, the court must next determine whether a significant and legitimate purpose, such as the remedying of a broad and general economic problem, justifies the state's regulation. Energy Reserves Group, supra, 459 U.S. at 412, 103 S.Ct. 697. Once a legitimate purpose is identified, the court inquires whether the modification reasonably and necessarily serves "an important public purpose." United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).
In State Farm, supra, our Supreme Court held that the plaintiff insurance companies did not have a contractual relationship which the State of New Jersey could impair. To the contrary, the Court noted "like all regulatory schemes, [the JUA] was potentially transient, subject to change at any time by the Legislature that created it. In a highly regulated business such as insurance, participants cannot credibly assert that they had any vested right or contractual expectation in the indefinite continuance of the JUA scheme." State Farm, supra, 124 N.J. at 64-65, 590 A.2d 191. The Court further held that even if the Fair Act impaired plaintiffs' contractual relationships, "it would nonetheless be justified in this instance because the [Fair] Act addresses a significant and legitimate public purpose, imposing reasonable conditions that are related to appropriate governmental objectives." Id.
In this case, there is no contractual relationship for the Act to impairnot between the HMOs and their insureds and certainly not between the HMOs and the Stateguaranteeing against the assessments at issue. With regard to the former, the terms of the HMOs' contracts of insurance do not guarantee a rate increase simply because the insurance policies allow for such increase upon policy renewal, and in any event do not bind the State, as regulator, to such a guarantee.
With regard to the latter, similar to the automobile insurers in State Farm, supra, HMOs function in a highly regulated industry. What our Supreme Court noted in State Farm in a similar context applies with equal persuasiveness here and that is that it strains credulity to maintain that HMOs had any vested right or contractual expectation in the indefinite avoidance of assessments for legitimate revenue-raising purposes.
On this score, it is settled that absent clear statutory language indicating *409 that the Legislature intended to bind itself contractually, a statute, such as the one empowering the Commissioner of Banking and Insurance to fix rates insurers may charge their policyholders and establish many of the specific terms of the insurance contracts, creates no private contractual or vested rights. Dodge v. Board of Educ., 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937). The principal function of the legislature is not to make contracts but to make laws that establish public policy. Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 104-05, 58 S.Ct. 443, 446, 82 L.Ed. 685, 690 (1938). A court should not construe a scheme of public regulation to establish a private contract to which the State is a party. National R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co., 470 U.S. 451, 466-67, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432, 446 (1985). "[T]o construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body." Ibid. Accordingly, plaintiff has not met even the threshold inquiry because there is no absolute guarantee of a rate increase which creates a contractual right.
Even assuming, however, some infringement upon a contractual right, plaintiff has not demonstrated that the Act "substantially impaired" such a right. In this regard, plaintiff itself acknowledges that the Act provides a safety valve for rate relief to HMOs if exclusion of the assessment in the HMO's rate scheme will "significantly and adversely affect the organization" (N.J.S.A. 17B:32B-9h), which we have construed to meet the constitutional standard of a fair rate of return. Given this constitutional safeguard, the assessments imposed do not, as a matter of law, "substantially impair" any contractual right of plaintiff's members.
Even further assuming a "substantial impairment," the Act addresses an overriding "significant and legitimate public purpose, imposing reasonable conditions that are related to appropriate governmental objectives." See State Farm, supra, 124 N.J. at 65, 590 A.2d 191; see also, Energy Reserves Group, supra, 459 U.S. at 411, 103 S.Ct. at 704, 74 L.Ed.2d at 581. These significant and legitimate public purposes include continued access to reasonable cost health care services from providers who service HMOs who would otherwise endure substantial financial losses due to the insolvencies of two members of the HMO industry.
In sum, the necessary predicate for a contract impairment claim is lacking in this case. There is no contract guaranteeing a rate increase to plaintiff's members. Furthermore, even if there were such a contract, there is no substantial impairment of any right created thereunder because of the mechanism within the Act providing rate relief. Finally, the Act is reasonable and necessary to fulfill an important public purpose of protecting both covered individuals and providers from absorbing significant financial losses which could conceivably affect the cost and availability of the health care services received by the public and HMOs in this State. There being no demonstrated violation of the Contract Clauses of the Federal and State Constitutions, plaintiff's complaint will be dismissed with prejudice.

THE ACT IS NOT A BILL OF ATTAINDER
Lastly, plaintiff argues that the imposition of assessments is legislative retaliation seeking to punish the HMOs because of their "strong opposition to the Act, and for the industry's exposure of the HIP/APPP insolvencies as a failure by the government *410 of this State to properly regulate HMOs." Complaint, ¶ 56.
A bill of attainder is legislation that punishes an individual or ascertainable group for past conduct without a judicial trial. United States v. Brown, 381 U.S. 437, 447, 85 S.Ct. 1707, 14 L.Ed. 2d 484 (1965); United States v. Lovett, 328 U.S. 303, 315, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1866); In re Disciplinary Proceedings Against C. Schmidt & Sons, Inc., 79 N.J. 344, 356-57, 399 A.2d 637 (1979). The proscription against bills of attainder reaches only statutes that inflict punishment. Selective Ser. Sys. v. Minn. Public Trust Research Group, 468 U.S. 841, 851, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984); Matter of Coruzzi, 95 N.J. 557, 578, 472 A.2d 546 (1984). However, the mere imposition of burdens on citizens by legislation does not constitute punishment. See Nixon v. Administrator of General Services, 433 U.S. 425, 472, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Indeed, the severity of the legislative sanction alone does not determine if the law is punitive. Flemming v. Nestor, 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Courts use the bill of attainder clause to invalidate laws sparingly because "all legislation regulating economic activity might be considered `punishment,' " and broad application of the doctrine could "cripple the ability of legislatures to respond to some perceived social or economic problem." Long Island Lighting Co. v. Cuomo, 666 F.Supp. 370, 403 (N.D.N.Y.1987) (holding that the exclusion of power company's costs from its rate base was not punishment under Bill of Attainder Clause). Notably, the United States Supreme Court wrote:
However expansive the prohibition against bills of attainder, it surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals. In short, while the Bill of Attainder Clause serves as an important bulwark against tyranny, United States v. Brown, 381 U.S. at 443, [85 S.Ct. 1707] it does not do so by limiting Congress to the choice of legislating for the universe, or legislating only benefits, or not legislating at all.
[Nixon v. Administrator of General Services, supra, 433 U.S. at 471, 97 S.Ct. 2777.]
In determining whether a statute inflicts forbidden punishment, the United States Supreme Court has distilled three recurring characteristics of bills of attainder: (1) whether the challenged law falls within the historic definition of legislative punishment, [Nixon v. Administrator of General Services, 433 U.S. 425, 473-75, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (noting that the historic definition of punishment includes death sentences, imprisonment, banishment, confiscation of property, and barring the attained parties from specified employment)]; (2) whether the challenged statute can reasonably be viewed to further nonpunitive goals, [Nixon, supra, 433 U.S. at 475-76, 97 S.Ct. 2777]; and (3) whether the legislative record demonstrates an intent to punish. Selective Ser. Sys., supra, 468 U.S. at 852, 104 S.Ct. 3348; Nixon, supra, 433 U.S. at 478, 97 S.Ct. 2777.
Since the Act has been found not to be "confiscatory" under a takings analysis, a fortiori it does not constitute a punitive confiscation, and the Act thus does not meet the first of the three standards for a bill of attainder. Moreover, as our substantive due process analysis would indicate, the Act reasonably may be viewed as furthering non-punitive goals, namely the *411 legitimate legislative purpose of ensuring the continued availability of medical care at reasonable cost, and thus does not meet the second criterion as well. As to the third criterion, since the Act does not constitute a punitive taking, there is no legislative intent to punish. In any event, plaintiff fails to demonstrate any motivational bias in the legislative history available as a matter of public record. And even if plaintiff were able to point to some bias in the legislative record, it would need to have played a significant role in the enactment of the Act, (State Farm, supra, 124 N.J. at 66, 590 A.2d 191), which plaintiff has simply failed to demonstrate in this case. Therefore, the Act does not exhibit any of the characteristics of a bill of attainder as they have been defined in law. Id. Accordingly, the fifth count of plaintiff's complaint will be dismissed with prejudice.

CONCLUSION
Plaintiff's multi-faceted, facial constitutional challenge fails on all counts. The Act has been reasonably construed as not necessarily precluding plaintiff's member HMOs of a fair rate of return on their investment. As such, the assessments are neither "confiscatory" nor "punitive" and do not impairmuch less significantly impairany possible contractual rights plaintiff's members might have by virtue of the insurance policies they issue or the regulatory framework within which they operate. Further, because the assessments represent a reasonable means of achieving a legitimate governmental objective and the burdened class has been rationally selected as one of the beneficiaries of the legislative scheme, plaintiff's members have been denied neither substantive due process nor equal protection of the law. For all these reasons, plaintiff's complaint will be dismissed in its entirety, with prejudice.
NOTES
[1] Significantly, while the insurers in State Farm premised their challenges upon, but failed to prove, their claim that the assessments and surtaxes compelled them to suffer a negative rate of return, no hearing was held before our Supreme Court flatly rejected their facial constitutional attack. Procedurally, plaintiff insurers in State Farm had originally sought a preliminary injunction in the Chancery Division to stop the State from collecting the assessment. State Farm, supra, 124 N.J. at 39, 590 A.2d 191. The trial court granted the injunction and ordered a hearing on whether State Farm could obtain a fair rate of return notwithstanding the exclusion of the assessment from the expense base in a rate filing. Ibid. The State immediately appealed and the Appellate Division granted a stay of the injunction which the Supreme Court did not disturb. Id. at 40, 590 A.2d 191. Subsequently, after the State's motion for leave to appeal was granted, State Farm moved for direct certification which was granted. Ibid.
[2] State Farm left open the question whether assessing insurers that sold no automobile insurance to pay JUA's indebtedness is constitutional. However, Matter of American Reliance Insurance Co., 251 N.J.Super. 541, 598 A.2d 1219 (App.Div.1991), answers that question by upholding the constitutionality of the assessments against insurers that have not sold automobile insurance. In American Reliance, New Jersey based domiciled property and casualty mutual insurers contended that it would be unfair to require them to pay the Fair Act assessments because they had never written automobile insurance, had never been servicing carriers of the JUA and derived no financial benefit from the JUA. Id., 251 N.J.Super. at 548, 598 A.2d 1219. They argued that, among other things, subjecting them to the assessments constituted an unlawful taking of their property without just compensation. That argument was soundly rejected. Guided by State Farm, supra, the Appellate Division construed the pertinent statutes as evidencing a "legislative recognition of the State's overarching constitutional obligation to assure all insurers a reasonable rate of return." American Reliance, supra at 556. That construction, the Court held, led to the conclusion that the Fair Act does not, on its face, impose a confiscatory taking with respect to property and casualty insurers that sell no automobile insurance.
[3] N.J.S.A. 26:2J-8(b) provides:

[N]o schedule of charges for enrollee coverage for health care services, or amendment thereto, may be used by a health maintenance organization until a copy of such schedule, or amendment thereto, has been filed with the Commissioner of Insurance for informational purposes; provided, however, that the Commissioner of Insurance may bring an enforcement action ... if the commissioner has reason to believe that the rates are excessive, inadequate or unfairly discriminatory. (emphasis supplied)
N.J.S.A. 26:2J-4.3e which governs "basic policies" only, provides:
Notwithstanding any other law to the contrary, a health maintenance organization shall file all rates . . . for approval with the Commissioner of Insurance at least 60 days prior to becoming effective. Unless disapproved by the Commissioner prior to their effective date specifying in what respects the filing is not in compliance with the standards set forth in this subsection, any such rates ... shall be deemed approved as of their date. Rates shall not be excessive, inadequate or unfairly discriminatory. (emphasis supplied).