39 A.3d 228

HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, PLAIN-
TIFF–APPELLANT, v. THE STATE OF NEW JERSEY, THE
DIVISION OF TAXATION OF THE DEPARTMENT OF TREA-
SURY OF THE STATE OF NEW JERSEY, ROBERT K. THOMP-
SON, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF
THE DIVISION OF TAXATION OF THE STATE OF NEW JER-
SEY, THE DEPARTMENT OF BANKING AND INSURANCE OF
THE STATE OF NEW JERSEY, AND DONALD BRYAN, IN HIS
OFFICIAL CAPACITY AS THE ACTING COMMISSIONER OF
THE DEPARTMENT OF BANKING AND INSURANCE OF THE
STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 4, 2011—Decided March 7, 2012.

2

4

8

Before Judges CARCHMAN, FISHER and NUGENT.

*James P. Flynn* argued the cause for appellant (*Epstein, Becker & Green, P.C.*, attorneys; *Mr. Flynn,* of counsel; *Michael J. Slocum,* on the briefs).

*Marlene G. Brown,* Senior Deputy Attorney General, argued the cause for respondents (*Paula T. Dow,* Attorney General,

attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Ms. Brown,* on the brief).

The opinion of the court was delivered by

CARCHMAN, P.J.A.D.

Plaintiff Horizon Blue Cross Blue Shield of New Jersey appeals from a judgment of the Tax Court denying its claim for a refund of $145,000,000, concluding that the Premium Tax Cap Statute (PTC), *N.J.S.A.* 54:18A–6, as amended by Assembly Bill A4401 (A4401), *L.* 2005, *c.* 128, was not unconstitutional as a denial of due process or equal protection, a bill of attainder, or special legislation. By its terms, A4401 eliminated the tax cap on premiums received by health service corporations (HSCs) when at all relevant times, plaintiff was the only HSC in New Jersey. Among its other claims, plaintiff charged that it was singled out for retaliation after it refused to convert to for-profit status.

We conclude that plaintiff's claims are without merit. A4401 was rationally related to the legislative goals of raising revenue to reduce a budget deficit as well as to eliminate a loophole in the tax law whereby HSCs had a lower effective tax rate than other health insurance carriers. We further conclude that plaintiff's claim of retaliation is likewise without merit, and the trial judge properly denied plaintiff's motion for additional discovery and properly granted defendants'[1] motion for summary judgment.

Accordingly, we affirm.

## I.

### A.

These are the relevant facts adduced from the record. In 1938,

---

[1] The named defendants are the State of New Jersey; The Division of Taxation of the Department of Treasury of the State of New Jersey; Robert K. Thompson, Director of the Division of Taxation of the State of New Jersey; the Department of Banking and Insurance of the State of New Jersey; and Donald Bryan, Acting Commissioner of the Department of Banking and Insurance of the State of New Jersey.

the Legislature authorized the establishment of HSCs.[2] *L.* 1938, *c.* 366. HSCs are charitable and benevolent institutions exempt from all state and local taxes other than real estate equipment tax. *N.J.S.A.* 17:48–18. In that same year plaintiff's predecessor, the Hospital Service Plan of New Jersey, was authorized to operate as an HSC, and as we have noted, plaintiff and its predecessor is and has been the only HSC to operate in New Jersey. To qualify as an HSC, a corporation must be "organized, without capital stock and not for profit, for the purpose of (1) establishing, maintaining and operating a nonprofit health service plan and (2) supplying services in connection with (a) the providing of health care or (b) conducting the business of insurance as provided for in this act." *N.J.S.A.* 17:48E–1e.

HSCs were created to provide hospital and medical care on a pre-paid basis. The distinguishing features between HSCs and insurers are: the nature of the agreements between HSCs and the providers concerning the payments for services; the limitations on the ability of HSCs to rate or reject unhealthy risks; and the non-profit status of HSCs.

When enacted in 1945, the Corporation Business Tax Act (CBT), *N.J.S.A.* 54:10A–1 to –41, exempted insurance companies. Rather, those companies were subject to the PTC, which also was enacted in 1945. Prior to its 2005 amendment, the PTC provided:

> In the event that the taxable premiums collected ... during any year ending December 31, exceed twelve and one-half percentum (12 1/2) of the total premiums collected by the company and all of its affiliates during the same year on all policies and contracts of insurance whenever and wherever issued, the taxable premiums of such company shall not exceed a sum equal to twelve and one-half percentum (12 1/2%) of such company's total premiums collected during the same year on all policies and contracts of insurance....

An insurance premium tax (IPT) was utilized because often the net income of insurers was difficult to determine, in part because of the need for reserves to cover future unknown events and the

---

2 Although now designated as health service corporations, HSCs were previously known as hospital service corporations.

year-to-year fluctuation in income. The statutory cap was known as the 1/8th Rule. Plaintiff, as an HSC, was initially not subject to the IPT; however, under the Health Maintenance Organizations Act, *N.J.S.A.* 26:2J–3 to –47, HMOs were subject to the CBT.

In 1985, plaintiff, as an HSC, was required to serve as the insurer of last resort for the state. *L.* 1985, *c.* 235. That obligation was modified in 1992 when the Legislature required all health carriers in New Jersey to participate in the individual market. In 1992, plaintiff became subject to the IPT; it remained exempt from the CBT. As part of its fiscal year 2005 budget, the Legislature required HMOs to pay a one-time, one percent assessment on their net written premiums to fund charity care payments to hospitals. In the same budget, the Legislature requested that the State treasurer prepare a report setting forth other sources of funding for charity care and examining the equities of the overall health insurance tax system. One specific request was for the treasurer to examine "loopholes" in the PTC by which "certain insurance entities either pay no tax or less tax than other similar insurance entities," and to review ways to remedy these "inequities."

The report issued by the treasurer found that plaintiff, with total premiums of approximately $2,628,000,000 in 2003, paid an effective tax rate of less than 0.1 percent, as opposed to insurers, which paid an effective tax rate of approximately 1.1 percent. Plaintiff was taxed under the IPT 1/8th Rule only on premiums from large groups, at the rate of 1.05 percent, unlike insurers, which were also taxed on their individual and small group business.

At the same time, the Legislature was addressing the annual state budget and considering new sources of revenue as there was an estimated $4,000,000,000 budget gap. One measure considered was Assembly Bill A2917, which had been introduced in May 2004, and which proposed granting the Commissioner of Banking and Insurance the authority to allocate certain excess surplus of HSCs to hospitals to pay for charity care. That measure did not pass.

The bill targeted some $300,000,000 in plaintiff's reserves, but was deemed to be illegal in the opinion of the State treasurer.

A4401, as originally introduced, would have eliminated the 1/8th rule for both insurers and HSCs doing business in the state. However, on the day the Assembly Budget Committee met to discuss the bill, it announced that A4401 had been amended to exclude only HSCs, rather than all insurers, from the 1/8th Rule. Representatives from several insurance companies appeared and, based on newly amended proposed legislation, withdrew from the committee proceedings, while plaintiff's representative then addressed the committee:

> I would like to express our concern with this legislation. The Bill, as introduced, was ... approximately 20 pages that leave an impact across the industry. The one provision that remains is a provision that only impacts Horizon.... [T]he provision that remains originally impacted a number of other domestic insurers.... They were all cut out, so the bill now only impacts Horizon.... I'm not quite sure why that is the case.

A4401 was enacted and signed into law by the Governor on July 2, 2005.[3] It created a subsection b to *N.J.S.A.* 54:18A–6 providing: "On and after January 1, 2005 the provisions of subsection a. of this section shall not apply to a health service corporation established pursuant to the provisions of P.L.1985, c. 236 (C.17:48E–1 *et seq.*)." It also created a subsection b(2) to *N.J.S.A.* 54:18A–9 to require that HSCs pay IBT on all premiums as of January 1, 2005.

---

[3] A4401 provides in relevant part:

Section 6 of P.L.1945, c. 132 (C.54:18A–6) is amended to read as follows:

6. a. In the event that the taxable premiums collected by any company ... during any year ending December 31, exceed twelve and one-half percentum (12 1/2%) of the total premiums collected by the company and all of its affiliates during the same year on all policies and contracts of insurance, whenever and wherever issued, the taxable premiums of such company shall not exceed a sum equal to twelve and one-half percentum (12 1/2%) of such company's total premiums collected during the same year on all policies and contracts of insurance....

b. On and after January 1, 2005 the provisions of subsection a. of this section shall not apply to a health service corporation established pursuant to the provisions of P.L.1985, c. 236 (C.17:48E–1 et seq.).

Additions are indicated by underline.

Concurrently, the Legislature enacted *L.* 2005, *c.* 129, *N.J.S.A.* 26:2J–47, which extended the one time, one percent CBT assessment on HMOs to a recurring annual assessment.

During the summer of 2005, plaintiff ended discussions with New Jersey officials concerning plaintiff's possible conversion from a non-profit company to a for-profit entity.

During the period from 2005 to 2008, as a result of the application of A4401, plaintiff paid an additional $145,000,000 in taxes. As of 2009, plaintiff provided coverage to over 3,600,000 people in New Jersey, and employed approximately 5000 people.

In concluding that A4401 was not special legislation, the court stated:

> [T]he purpose or objective of A4401 was to raise revenue and correct an inequity in the state's taxing scheme of HSCs. To achieve this objective, A4401 excluded all HSCs from the 1/8th Rule. Finally, by subjecting all premiums collected by HSCs to taxation the Legislature has created the possibility for increased revenue and has abandoned preferential tax treatment towards HSCs. Consequently, A4401 rests upon a reasonable basis relevant to the purpose and object behind A4401.
>
> The fact that the HSC class consists of one member—Horizon—does not make the amendment special legislation *per se.* The inquiry to determine if it is special legislation instead must be whether any other entity should have been included. A4401 though encompasses the entire HSC class, which ... [is comprised of] unique entities that the Legislature may legislate differently from other insurance entities. As a result, A4401 does not exclude entities that should have been included.
>
> [25 *N.J.Tax* 290, 314 (Tax Ct.2009) (internal citations omitted).]

In rejecting plaintiff's equal protection and due process claims, the court initially found that A4401 was not inconsistent with the original purpose of the PTC, namely, to encourage insurers to conduct more business in New Jersey:

> The court is satisfied that A4401 represents a Legislative determination that HSCs should pay a tax on *all* of their premiums, rather than on, at most, twelve and one-half percent ... of their premiums. Conceivably, expanding the number of premiums subject to taxation will result in increased revenue for the state, and therefore serves a legitimate state purpose.
>
> Second, Horizon's argument ... is conclusory. Horizon cites to no case, and indeed no case has been found by this court, which holds that an amendment to a statute must be consistent with the original intent of the statute it amends in order for there to be a legitimate state purpose which supports the amendment....

> Furthermore, while an inconsistency between A4401 and the Premium Tax Cap Statute may exist, "it is not the function of the court[ ] to evaluate the efficacy or wisdom of a particular legislative enactment."
>
> [25 *N.J.Tax* at 305–06 (footnote and citation omitted).]

The court found that the timing of the legislation alone was evidence too speculative to support an inference of a vindictive and retaliatory motive. *Id.* at 306. As originally written, A4401 excluded all insurers from the PTC and, despite Horizon's contention that A4401 was introduced immediately after discussions ended about Horizon's conversion to for-profit status, it was unclear "exactly when those negotiations ended and what effect, if any, the end of negotiations may have had on future legislative proceedings. While the timing of A4401 may [have been] cause for suspicion, the court [could not] conclude based on mere conjecture that the Legislature ... acted improperly." *Id.* at 306–07. The court concluded that Horizon failed to establish that A4401 did not have a legitimate state purpose. *Id.* at 307.

The court also rejected Horizon's contention that there was no rational basis for the legislation to be directed only at Horizon. *Id.* at 307–08. The court stated:

> This court finds that A4401 is not directed at Horizon. Rather in enacting A4401, the Legislature sought to regulate HSCs as a class, of which Horizon is the only member. Equal protection is not violated where a legislative classification consists of a single member.... Horizon attempts to equate itself to other insurance providers in the state of New Jersey. However ... the historical development of Horizon and its legal status illustrates the rational basis for enacting A4401.
>
> [*Id.* at 308.]

Based on this history, the court concluded that the Legislature did have a rational basis to exclude only HSCs from the 1/8th Rule. There was an inequity in the taxing structure of insurance entities. HSCs were afforded a benefit for a period of time because of [their] unique status as ... HSC[s]. Now it is the unique characteristics of HSCs that have caused such preferential treatment to be abandoned. Accordingly, the court finds that A4401 is rationally related to a legitimate state purpose and does not violate Horizon's constitutional right to equal protection and due process.

> [*Id.* at 310.]

The fact that all insurers, including HSCs, have benefited from the Premium Tax Cap Statute in the past does not mean that the State must treat HSCs and other

insurers alike moving forward.... HSCs and other insurers are *different* corporate entities that the Legislature may treat differently for taxing purposes. [*Id.* at 312.]

The court found that A4401 was not a bill of attainder because taxation did not constitute a traditional definition of punishment, A4401 could be viewed as furthering non-punitive legislative goals, and the evidence was insufficient to merit a finding that the Legislature acted with any improper intent. *Id.* at 315–16. With respect to the latter finding, the court stated:

With regard to A2917 ... this proposed legislation was never adopted by the Legislature and [was] never part of the legislative history of A4401....[4]

[*Id.* at 316.]

In rejecting plaintiff's manifest injustice claim, the court stated:

Horizon has operated under the 1/8th Rule since 1992.... The enactment of A4401 in July 2005 came in the middle of Horizon's insurance premium tax year. Consequently, Horizon was already liable for an insurance premium tax at the time of the enactment. The effect of the amendment was to increase Horizon's insurance premium tax liability. The fact that Horizon was already liable for an insurance premium distinguishes this case from ... the retroactive application of [a] statute ... result[ing] in the imposition of a tax.... As a result, this court finds no manifest injustice.

[*Id.* at 318.]

## B.

On appeal, plaintiff raises two procedural arguments: that the court erred by refusing to compel discovery as well as by granting summary judgment when there were material issues of fact in dispute. In addition, plaintiff asserts, on the merits, that the

---

[4] During the Budget Committee hearing, the Committee Chair engaged in a colloquy that plaintiff characterized as "giddy," and an example of "discriminatory legislative animus." The trial judge commented:

Furthermore, the "giddy" roll call by [the Chairman] ... can *at best* be viewed as some indication that the Chairman might have personally had an improper motive, but is clearly not indicative of the intent of the Legislature when it enacted A4401.... Assuming *arguendo* that some members of the Legislature held an improper motive, Horizon has failed to show that the motive played a significant part in the legislative process.

[*Id.* at 316–17.]

judge erred by concluding: 1) A4401 is not special legislation; 2) A4401 did not violate plaintiff's rights of due process and equal protection; 3) A4401 is not a bill of attainder; and 4) A4401 did not work a manifest injustice upon plaintiff. We first address the substantive issues.

## II.

Plaintiff argues that A4401 is prohibited special legislation because plaintiff's exclusion from the benefit of the 1/8th Rule is contrary to the purpose of the PTC, and because the legislation targeted plaintiff for a refusal to convert to for-profit status.

The New Jersey Constitution provides that "[t]he Legislature shall not pass any ... special ... law[ ] ... [r]elating to taxation or exemption therefrom." *N.J. Const.* art. IV, § 7, ¶ 9. The inquiry into whether a statute constitutes special legislation focuses upon what an enactment excludes and the appropriateness of that exclusion, when considered in the context of the statute's legislative purpose. *N.J. State Bar Ass'n v. State*, 387 *N.J.Super.* 24, 51, 902 *A.*2d 944 (App.Div.), *certif. denied*, 188 *N.J.* 491, 909 *A.*2d 726 (2006). A statute is not special legislation if the class established has characteristics sufficiently marked and important to make it a class by itself, it encompasses all of the subjects that reasonably belong within the classification, and it does not exclude any that naturally belong within the classification. *Ibid.*

The test for whether legislation is general or special involves examining the purpose and object of the enactment, as applied to the facts of the case, and determining whether the resulting classification rests upon any rational or reasonable basis relevant to the purpose and object of the legislation. *Vreeland v. Byrne*, 72 *N.J.* 292, 300–01, 370 *A.*2d 825 (1977). Special legislation analysis is similar to an equal protection analysis, *Camden City Bd. of Educ. v. McGreevey*, 369 *N.J.Super.* 592, 605, 850 *A.*2d 505 (App.Div.2004). That analysis addresses whether there is any rational basis for the legislative classification, the impact of which,

whether positive or negative, falls on a single person or entity. *See McKenney v. Byrne,* 82 *N.J.* 304, 317, 412 *A.*2d 1041 (1980).

"[T]he Legislature has wide discretion in determining the perimeters of a classification and an adequate factual basis for the legislative judgment is presumed to exist." *N.J. State Bar Ass'n, supra,* 387 *N.J.Super.* at 52, 902 *A.*2d 944 (quotations, citations and editing marks in original omitted). The party challenging the legislation bears the burden of establishing that the statute is unconstitutional special legislation. *Ibid.* The classification "will not be set aside if any state of facts reasonably may be conceived to justify it." *Camden City Bd. of Educ., supra,* 369 *N.J.Super.* at 605, 850·*A.*2d 505 (quoting *Paul Kimball Hosp. v. Brick Twp. Hosp.,* 86 *N.J.* 429, 441, 432 *A.*2d 36 (1981)).

Plaintiff relies on *Raybestos–Manhattan, Inc. v. Glaser,* 144 *N.J.Super.* 152, 365 *A.*2d 1 (Ch.Div.1976), *aff'd o.b.,* 156 *N.J.Super.* 513, 384 *A.*2d 176 (App.Div.1978). In *Raybestos–Manhattan,* the plaintiff, a manufacturing corporation, claimed that the Private Nonvested Pension Benefits Protection Act of 1973(Act) constituted special legislation. *Id.* at 161, 166, 365 *A.*2d 1. In 1972, the plaintiff announced its intention to close its New Jersey manufacturing facility. *Id.* at 162, 365 *A.*2d 1. Over 1000 of the plaintiff's employees were members of the company's pension plan. *Ibid.* However, when the company closed its facility in mid–1973, approximately 880 of those employees did not qualify for pensioned retirement. *Id.* at 162–63, 365 *A.*2d 1.

Less than a month after the plaintiff announced its intention to close the facility, a bill was introduced in the Assembly that called for a tax on every employer of fifty or more persons within the State who ceased to operate a place of employment in the State. *Id.* at 163, 365 *A.*2d 1. A substitute bill, which eventually became law, was introduced in the Senate. It imposed a tax on employers of 500 or more persons within the State that provided pension benefits and that ceased to operate a place of employment in the State. *Id.* at 163–64, 365 *A.*2d 1. From the amount collected, employees who had completed fifteen years of covered service

under the pension plan could collect the current value of the benefits. *Id.* at 164, 365 *A.*2d 1. The Act, which became law in May 1973, was to expire on July 1, 1974. The Act was subsequently extended to July 1, 1975. *Ibid.*

The court found that there was no rational basis to justify protecting the unvested pension benefits of employees of a firm employing 500 or more persons while excluding employees of companies employing less than that number. *Id.* at 179, 365 *A.*2d 1. "The number of employees in a firm can in no way be logically related to their need for protection of their unvested pension benefits." *Id.* at 180, 365 *A.*2d 1. The employees protected by the Act were not readily distinguishable from those excluded from protection. *Ibid.* The court, therefore, concluded that the classification constituted special legislation. *Id.* at 181, 365 *A.*2d 1.

The court noted that the legislative history left "little doubt that the termination of operations by plaintiff and the resulting loss of pension benefits to its employees led to the promulgation of the [A]ct." *Id.* at 182, 365 *A.*2d 1. "[T]he evolution of the [A]ct in the Legislature indicates a continuous effort by the lawmakers to restrict the applicability and burden of the [A]ct to plaintiff alone, while couching such restrictive classification in general terms." *Id.* at 183, 365 *A.*2d 1. The classification was narrowed to such a degree that the plaintiff was the only employer within the statutory definition. *Id.* at 188, 365 *A.*2d 1. Moreover, that the legislation was set to expire after one year was further indicative of its special nature. *Ibid.* The court concluded: "[t]his ongoing effort by the Legislature evidences a motivation to disguise in general terms a special classification[ ] aimed primarily at plaintiff, and . . . confirms that the classification is arbitrary and without rational basis." *Id.* at 189, 365 *A.*2d 1.

The legislation here is decidedly different from the legislation in *Raybestos–Manhattan.* A4401 is not time-limited. Moreover, unlike in *Raybestos–Manhattan,* where there was "little doubt" that the Act was a direct response to the plaintiff announcement that the plant was closing, here, the motivation was more expan-

sive and generalized. The wide-ranging need for revenue in the face of a budget deficit played a large role, as did the desire to correct perceived inequities in the tax law. In addition, the legislation in *Raybestos–Manhattan* was based solely on the number of employees of a company, not on the company's inherent characteristics. *Raybestos–Manhattan* is not relevant to our consideration of A4401.

That plaintiff is the only entity that falling with the scope of A4401 does not render the bill special legislation. *See Paul Kimball Hosp., supra,* 86 *N.J.* at 448, 432 *A.*2d 36. If the classification is valid, it is immaterial how many or how few entities compose the class. *Raybestos–Manhattan, supra,* 144 *N.J.Super.* at 185, 365 *A.*2d 1. The test is not what the classification includes, but whether the classification excludes some that should be included. *City of Jersey City v. Farmer,* 329 *N.J.Super.* 27, 38, 746 *A.*2d 1018 (App.Div.), *certif. denied,* 165 *N.J.* 135, 754 *A.*2d 1211 (2000). The fact that plaintiff was the target of the legislation is not, by itself, determinative. "[T]he reason precipitating the legislative action is not determinative, for even a statute intended to be special may be a general one." *Raybestos–Manhattan, supra,* 144 *N.J.Super.* at 186, 365 *A.*2d 1.

The purposes behind A4401 were to raise revenue in the face of a budget deficit and to end the preferential tax treatment for HSCs that had resulted in plaintiff's paying an effective IPT rate of less than 0.1 percent while other insurers paid more. Ending HSCs' entitlement to the benefits of the 1/8th Rule was rationally related to the purpose of the legislation. Moreover, HMOs were also subject to increased taxation as part of the Legislature's effort to close the budget deficit; they were subject to a recurring one percent assessment.

Plaintiff asserts that the purpose of the PTC was to encourage insurers to conduct more business within New Jersey. *Am. Fire and Cas. Co. v. N.J. Div. of Taxation,* 189 *N.J.* 65, 81, 912 *A.*2d 126 (2006). However, raising revenue and correcting perceived inequities in the tax law can also serve as public purposes. *See*

*State v. Churchdale Leasing, Inc.*, 115 *N.J.* 83, 110, 557 *A.*2d 277 (1989) (noting that penalty provisions of a statute setting forth the maximum permissible weight of vehicles rationally related to the public purpose of raising revenue and repairing roads). In sum, there was a rational relationship between the purpose and object of A4401 and the classification of HSCs as ineligible for the 1/8th Rule. A4401 is not special legislation.

### III.

Plaintiff next maintains that A4401 violated its due process and equal protection rights because there was no rational basis for excluding HSCs from entitlement to the 1/8th Rule when other companies that write health insurance in New Jersey have the benefit of the rule. It claims that there was no inherent difference between an HSC and any other insurer to justify the differential treatment.

As with all statutes, A4401 bears a strong presumption of constitutional validity that is not readily overcome. *See Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 222, 486 *A.*2d 305 (1985). Its constitutional repugnancy must be clear in order to be stricken. *Paul Kimball Hosp., supra,* 86 *N.J.* at 447, 432 *A.*2d 36. Moreover, where taxation is at issue, a state legislature is accorded a wide latitude. *Carmichael v. S. Coal & Coke Co.,* 301 *U.S.* 495, 510, 57 *S.Ct.* 868, 872, 81 *L.Ed.* 1245, 1253 (1937).

When considering an equal protection argument, we apply certain basic principles. We first address the standard that we will apply. We conclude that no fundamental right or suspect class is implicated here. Thus, under federal equal protection analysis, the rational basis standard applies. *N.J. State Bar Ass'n v. Berman,* 259 *N.J.Super.* 137, 145, 611 *A.*2d 1119 (App.Div.1992). Under this standard, a classification will withstand challenge if it is rationally related to a legitimate governmental purpose. *Ibid.* The inquiry is whether there is any conceivable state of facts that

would afford a rational basis for the classification. *Id.* at 145–46, 611 *A.*2d 1119. Only where the classification rests on grounds wholly irrelevant to the achievement of the State's objective is there an equal protection violation. *Id.* at 146, 611 *A.*2d 1119. Legislation cannot be invalidated merely by offering evidence that the Legislature was mistaken in its classification because "imperfect classifications that are part of a reasonable legislative scheme do not violate the equal protection clause." *Id.* at 145, 611 *A.*2d 1119 (quoting *Murphy v. Allstate Ins. Co.*, 252 *N.J.Super.* 280, 286, 599 *A.*2d 916 (App.Div.1991)). Where taxation is concerned, and equal protection is implicated, the State has broad leeway in making classifications and drawing lines. *Id.* at 146, 611 *A.*2d 1119.

 New Jersey equal protection law employs a balancing test that considers the nature of the affected right, the extent to which the legislation intrudes upon it, and the public need for the legislation. *Greenberg v. Kimmelman*, 99 *N.J.* 552, 567, 494 *A.*2d 294 (1985).

As we have noted, the Legislature sought to raise revenue to close a budget deficit. Of particular note, plaintiff was not the only member of the health insurance industry in New Jersey to pay higher taxes; HMOs were subject to additional taxation as part of this effort. In addition, the Legislature addressed an inequity in the tax law whereby plaintiff, as an HSC, was paying a lower effective tax rate than other health insurance carriers in the state. Moreover, unlike insurers, plaintiff was not subject to the IPT until 1992. It had received more favorable tax treatment than insurers for several decades.

In support of its argument, plaintiff cites *State Compensation Fund v. Symington*, 174 *Ariz.* 188, 848 *P.*2d 273, 276 (1993). In *Symington*, an alternative minimum tax was imposed on Arizona's state's workers' compensation fund to help balance the state budget and to eliminate the advantage the federally tax-exempt fund had over private workers' compensation carriers. The court held that the tax constituted special legislation because it did not

further the goal of balancing the budget or reducing the disparity between the plaintiff and private carriers. *Id.* at 278–79. The court found that the mere fact that the fund, unlike private carriers, was exempt from federal tax did not create a legitimate basis for imposing a tax on the fund, but not on private carriers. *Id.* at 279. The court also found that the tax did not rationally further the purpose of "leveling the playing field" because the possibility existed that the fund, if it were a private carrier, might owe less than the minimum tax in a given year. *Ibid.*

Here, the Legislature did not impose a new tax solely on one entity, a state agency. Rather, it eliminated favorable tax treatment for one *class* of carrier, of which plaintiff, coincidentally, was the sole member. Moreover, it is undisputed that raising revenue to balance a state budget is a legitimate public purpose.

Plaintiff also cites *Blue Cross and Blue Shield of Michigan v. Milliken*, 422 *Mich.* 1, 367 *N.W.*2d 1, *appeal dismissed*, 474 *U.S.* 805, 106 *S.Ct.* 40, 88 *L.Ed.*2d 33 (1985), in which the plaintiff challenged a statute that limited its right, as a health care corporation, to enter into administrative services only contracts (ASOs), but did not so limit the right of other insurers. *Id.* at 41. ASOs were arrangements whereby customers elected to be self-insured and pay the cost of the claims rather than a flat insurance premium. *Id.* at 40 n. 60. The court concluded that the statute violated the plaintiff's equal protection rights because there was no logical or rational basis for the disparate treatment; ASO business practices, and the risk factors involved, were the same whether conducted by health care corporations or commercial insurers. *Id.* at 40–41.

We do not consider *Milliken* to be relevant. Aside from the basic factual differences involved, the PTC is unique to New Jersey; out-of-state case law "does not provide meaningful guidance." *Am. Fire and Cas. Co., supra*, 189 *N.J.* at 80, 912 *A.*2d 126.

We reach a similar result regarding the due process argument. The due process provisions of the Federal and New Jersey Constitutions are not violated by legislative classification as long as it is rationally based on any conceivable state of facts which would afford a reasonable ground for the distinction drawn. *Wash. Nat'l Ins. Co. v. Bd. of Rev.*, 1 *N.J.* 545, 552, 64 *A.*2d 443 (1949). When, as here, the statute does not implicate a fundamental right, as long as it reasonably relates to a legislative purpose, and is not arbitrary or discriminatory, substantive due process will not be violated. *Greenberg, supra,* 99 *N.J.* at 563, 494 *A.*2d 294.

As with equal protection, A4401 is rationally related to the valid legislative goals of raising revenue to close a budget deficit and eliminating a loophole in the tax law. Moreover, since plaintiff is a well-established entity in this state, the policy behind the 1/8th Rule—an incentive to conduct more business in the state—should not trump the legislative goals that led to A4401. Plaintiff was permitted to take advantage of the rule only after spending several years as the statutorily mandated insurer of last resort, and after nearly fifty years during which plaintiff was not subject to the IPT at all. There is no indication that plaintiff, or a future HSC, will be statutorily mandated as the insurer of last resort in the state. Furthermore, an HSC's entitlement to the 1/8th Rule is less of a financial necessity now than it was for plaintiff in 1992.

We conclude that A4401 did not violate plaintiff's equal protection or due process rights.

## IV.

Plaintiff argues that A4401 constitutes a bill of attainder because the legislation was retribution against plaintiff for failing to convert to for-profit status.

A bill of attainder is a legislative act which levies punishment against specified individuals or groups without judicial trial. *Schundler v. Paulsen,* 340 *N.J.Super.* 319, 338, 774 *A.*2d 585 (App.Div.), *aff'd o.b.,* 168 *N.J.* 446, 775 *A.*2d 1261 (2001). In

determining whether a statute is a bill of attainder, we consider: whether the challenged statute falls within the historical meaning of legislative punishment; whether the statute, viewed in terms of the type and severity of the burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and whether the legislative record evinces an intent to punish. *Doe v. Poritz*, 142 *N.J.* 1, 76, 662 *A.*2d 367 (1995).

Here, the additional tax imposed on plaintiff by A4401 is not within the historic meaning of legislative punishment. A bona fide revenue-raising measure is not considered confiscation of property—an historic example of legislative punishment—because imposition of a tax is not considered a "taking." *N.J. Ass'n of Health Plans v. Farmer*, 342 *N.J.Super.* 536, 553–54, 777 *A.*2d 385 (Ch.Div.2000).

Furthermore, the mere imposition of burdens by legislation does not constitute punishment because, if it did, all legislation regulating economic activity might be considered punishment. *Id.* at 577, 777 *A.*2d 385. Broad application of the doctrine to such legislation could cripple the ability of legislatures to respond to a perceived social or economic problem. *Ibid.* Moreover, A4401 clearly furthers a nonpunitive legislative purpose by raising revenue to help close a budget deficit and correcting an inequity in the health insurance tax scheme.

Finally, there is no clear indication from the record that A4401 was adopted in order to punish plaintiff for not converting to for-profit status. The legislation was originally intended to apply to both insurers and HSCs. Neither the legislative history nor the trial court record demonstrates why insurers were dropped from the legislation. Nor is it clear whether the discussions between plaintiff and the State regarding conversion to for-profit status ended before or after A4401 was passed. Finally, we give little credence to "giddy" comments made during the legislative process as sufficient evidence of an intent to punish plaintiff.

We determine that the trial judge correctly concluded that A4401 was not a bill of attainder.

## V.

As its final merits argument, plaintiff contends that the court erred in not finding that A4401 constituted a manifest injustice because of its retroactive application. We disagree.

The doctrine of manifest injustice is designed to prevent unfair results that do not necessarily violate any constitutional provision. *Oberhand v. Dir., Div. of Taxation*, 193 *N.J.* 558, 572, 940 *A.*2d 1202 (2008) (quoting *State Troopers Fraternal Ass'n v. State*, 149 *N.J.* 38, 54, 692 *A.*2d 519 (1997)). Such an examination focuses on matters of unfairness and inequity relating to the retroactive application of a statute. *Ibid.* (quoting *In re D.C.*, 146 *N.J.* 31, 58, 679 *A.*2d 634 (1996)). The degree the affected party relied on existing law and the unfairness of changing the law are the important factors in making the retroactivity determination. *Ibid.* (quoting *In re D.C., supra,* 146 *N.J.* at 58, 679 *A.*2d 634). In evaluating these factors, a court must weigh the public interest in the retroactive application of the statute against the affected party's reliance on the statute prior to amendment and the consequences of that reliance. *Ibid.* (quoting *Nelson v. Bd. of Educ.*, 148 *N.J.* 358, 372, 689 *A.*2d 1342 (1997)).

In *Oberhand, id.* at 571–72, 940 *A.*2d 1202, the Court held that there was a manifest injustice in the retroactive application of a change in the estate tax to the decedents' estate, which had reasonably relied on the prior law in formulating a trust as part of the wills in question. It found that an amendment to "decouple" New Jersey's estate tax from the federal estate tax was intended primarily to prevent revenue loss after passage of the legislation, not in the six-month period prior to the passage during which the decedents passed away. *Id.* at 573, 940 *A.*2d 1202. In addition, the Court found that the decedents clearly relied on the previous law and did not have the opportunity to amend their estate plans to avoid the adverse estate tax consequences. *Id.* at 573–74, 940 *A.*2d 1202.

Here, the effect of the change in the law represented by A4401 was merely to increase plaintiff's liability, not to introduce a new liability in the middle of the tax year. Moreover, given the budget difficulties of the previous fiscal year, plaintiff could have anticipated that the Legislature would seek to raise revenue from corporate entities in the 2006 fiscal year. In addition, plaintiff was a taxpayer and corporate entity that had long been subject to changes in State taxation, as well as regulation and oversight. *See Edgewater Inv. Assocs. v. Borough of Edgewater,* 103 *N.J.* 227, 240–41, 510 *A.*2d 1178 (1986) (rejecting a claim of manifest injustice of retroactive application of a statute providing protection for senior citizens and disabled tenants in condominium conversions because the plaintiff's principals were professional investors acting in a heavily regulated field at a time when further regulation was being debated).

The fact-sensitive nature of cases such as *Oberhand* is reflected in *Klebanow v. Glaser,* 80 *N.J.* 367, 403 *A.*2d 897 (1979), where the plaintiff challenged a capital gains tax imposed on a transaction that took place seven months before the law was enacted. *Id.* at 369, 403 *A.*2d 897. In holding that the retroactivity of the tax did not violate due process, the Court noted that the plaintiff should have been aware that due to the State's fiscal situation, the State was seriously considering some form of income tax. *Id.* at 377, 403 *A.*2d 897. It further stated that given "the paramount governmental interest in obtaining adequate revenues, the extensive fiscal implications for the State in a financial crunch, apportionment of the costs of government equitably, the public controversy and numerous income tax bills . . . introduced [and] the limited retroactive effect of the statute," there was no due process violation. *Ibid.*

Plaintiff is not entitled to escape imposition of A4401 by application of the manifest injustice doctrine.

## VI.

We now address the issues of discovery and summary judgment.

A.

Plaintiff contends that the trial court erred in denying its motion to compel discovery. It maintains that the information sought was not irrelevant, and that defendants were not entitled to privilege under *N.J.S.A.* 54:50–8 and the deliberative process doctrine. In addition, plaintiff maintains that defendants' privilege logs were inadequate.

As part of its motion to compel discovery, plaintiff sought responsive answers from defendants to certain of its requests for admissions and interrogatories as well as a complete privilege log. Specifically, plaintiff sought discovery as to each and every insurance company that received a tax benefit under the PTC between 1995 and 2005; communications between the State and other insurance companies regarding the 2005 legislation; the legislative history of the statute and the 2005 legislation; data and computer analysis pertaining to the tax revenue to be gained from the adoption of A4401; inquiries, requests or reports relating to plaintiff's exclusion from the statute; legislative material and recordings of discussions involving the 2005 legislation; and studies and reports relating to premium tax paid by any other health insurers between 1995 and 2005.

In its response, defendants claimed that they could not name with specificity the taxpayers who benefited from the PTC between 1995 and 2005, and that there were no known studies or statistical data sought by plaintiff or, if there were, they would be protected by the intra-agency deliberative process privilege.

In denying the motion, the court stated:

I look at this request which just seems to be so voluminous and I'm not sure that there is any (indiscernible), and maybe it's because of this confidentiality issue that we don't really know what's out there. You know, sometimes we have to take each other at our word, we're not dealing ... with just John Q. Public here, we're dealing with officers of the Court. The State has produced a significant amount of evidence at this point, or potential evidence. And, they're saying there's really nothing more. We come up against these confidentiality statutes and protections that are privileges ... but I think ultimately the issue here is one of relevance. Where does this information get us with the ultimate issue of the case? And, I just don't see it gets us really anywhere....

And ... I'm not finding that the information that's requested is really relevant considering how difficult I believe it's going to be to acquire any additional information. I also ... believe that much of the information being requested is going to be subject to the privilege anyway, and I also believe especially with regard to tax returns, that the statute prohibits turning over those specific types of documents.

The disposition of discovery issues is normally a matter within the trial court's discretion, which will be deferred to absent a mistake of law. *Connolly v. Burger King Corp.*, 306 *N.J.Super.* 344, 349, 703 *A.*2d 941 (App.Div.1997).

New Jersey's discovery rules are to be construed liberally in favor of broad pretrial discovery of all relevant evidence. *Payton v. N.J. Turnpike Auth.*, 148 *N.J.* 524, 535, 691 *A.*2d 321 (1997). In deciding whether the evidence sought is relevant, the focus is on the logical connection between the proffered evidence and a fact in issue. *See ibid.* Although relevance creates a presumption of discoverability, that presumption can be overcome by demonstrating the applicability of an evidentiary privilege. *Id.* at 539, 691 *A.*2d 321 (citing *R.* 4:10–2(a)).

Moreover, the frequency or extent of use of the discovery methods otherwise permitted may be limited by the court if it determines that the discovery sought is unreasonably cumulative or duplicative, or the burden or expense of the proposed discovery outweighs its likely benefit. *R.* 4:10–2(g).

Plaintiff contends that the evidence it sought was relevant to the question of whether it was justifiably treated as a "class of one" for purposes of its equal protection, due process and special legislation claims. However, it is undisputed that plaintiff was the only HSC in the state and the only such carrier to qualify for the 1/8th Rule. Therefore, plaintiff failed to establish that information regarding other insurers and the IPT was relevant.

Nor does plaintiff's request for the legislative history of A4401 appear relevant. Not only is such an inquiry better addressed to legislative sources such as websites and records than to defendant members of the executive branch, but also the record

already contains information as to A4401's legislative history. The request was, at best, unreasonably cumulative.

As we conclude that the materials sought were not relevant, we need not address the issue as to whether the information sought by plaintiff was privileged under *N.J.S.A.* 54:50–8a (mandating that the records and files of the Director of the Division of Taxation are considered confidential and privileged). *See also First Nat'l City Bank v. Taxation Div. Dir.*, 5 *N.J.Tax.* 310, 319–20 (Tax Ct.1983) (precluding plaintiff's access to other taxpayer records, sought by plaintiff to determine if there was an equal protection violation, based on the preclusion of *N.J.S.A.* 54:50–8); *Monmouth Airlines, Inc. v. Dir., Div. of Taxation,* 2 *N.J.Tax* 47, 51–55 (Tax Ct.1980) (same).

We, likewise, need not consider the applicability of the deliberative process privilege. The Tax Court did not rely on this privilege in denying plaintiff's discovery request, unlike its reliance on *N.J.S.A.* 54:50–8. We do note that the "deliberative process" took place in the Legislature—which enacted the amendment to the statute—not in the agency defendants.

We reject plaintiff's claim that defendants' privilege log was insufficient to sustain its assertion of privilege. Plaintiff cites *Paff v. New Jersey Department of Labor,* 392 *N.J.Super.* 334, 341, 920 *A.*2d 731 (App.Div.2007), where, in the context of the Open Public Records Act (OPRA), *N.J.S.A.* 47:1A–1 to –13, we stated that when the public entity makes a privilege claim, it is required to produce a privilege log providing sufficient information regarding the basis of the claim for each document. "An accurate index is necessary for substantive review by the requesting party as well as the reviewing court." *Ibid.* This privilege log should include sworn statements setting forth in detail the search undertaken to satisfy the request, the documents found that are responsive to the request, the determination of whether a document is confidential, and a statement relating to the agency's document retention policy. *Ibid.*

Unlike *Paff,* this appeal does not involve OPRA. Rather, the privilege question is tangential to the main issues in the case and we need not address the parameters of such logs in tax cases. The trial judge concluded that it need not order additional or more detailed logs. We find no abuse of discretion in that regard.

### B.

Finally, plaintiff contends that even if the court were correct in denying plaintiff's motion for summary judgment, the court erred in granting defendants' cross-motion for summary judgment because it adopted defendants' version of the facts without providing plaintiff the opportunity to demonstrate that defendants' factual construct raised issues of material fact. We disagree.

The court found that both parties agreed that the matter was ripe for summary judgment because there was no genuine issue as to any material fact. 25 *N.J.Tax* at 302.

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c). If there exists a single unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a genuine issue of material fact. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). When the evidence is so one-sided that one party must prevail as a matter of law, summary judgment should be granted. *Ibid.*

Cross-motions for summary judgment do not preclude the existence of issues of fact. *O'Keeffe v. Snyder,* 83 *N.J.* 478, 487, 416 *A.*2d 862 (1980). A party is permitted to show that if its opponent's theory is adopted, there remains a genuine issue of material fact. *Ibid.* Where there are cross-motions for summary judgment, a party may make concessions for the purposes of its

motion that do not carry over to support the motion of its adversary. *Ibid.*

Specifically, plaintiff claims that the court adopted defendants' view as what effect plaintiff's decision not to convert to for-profit status had upon the passage of A4401. In fact, the court admitted that the effect, if any, that the plaintiff's decision had on the legislative process was unclear. Lack of clarity on a particular point is not equivalent to a dispute over an issue of material fact. Bare conclusory assertions, without factual support in the record, will not defeat a meritorious application for summary judgment. *Brae Asset Fund, L.P. v. Newman*, 327 *N.J.Super.* 129, 134, 742 *A.*2d 986 (App.Div.1999) (citations omitted). The opponent must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Triffin v. Am. Int'l Group, Inc.*, 372 *N.J.Super.* 517, 523–24, 859 *A.*2d 751 (App.Div. 2004) (citations omitted). The opponent must "come forward with evidence" that creates a genuine issue of material fact. *Brill, supra*, 142 *N.J.* at 529, 666 *A.*2d 146.

Although the court noted that the parties disputed whether plaintiff's conversion to for-profit status would have resulted in increased revenue for the State, resolution of this question was not an issue of material fact. Even assuming that the conversion would have increased the State's revenue, the revenue increase would not have affected the resolution of the plaintiff's substantive issues regarding its exclusion from the 1/8th Rule. Significantly, plaintiff did not request additional discovery to obtain information regarding the interaction between it and defendants relevant to its possible conversion to for-profit status.

Plaintiff also argues that the court improperly weighed the evidence with respect to its bill of attainder claim. On a motion for summary judgment, the court should not weigh the evidence. *Brill, supra*, 142 *N.J.* at 540, 666 *A.*2d 146. Here, the court found that the evidence produced by plaintiff was insufficient to establish either the existence of any improper intent, or that any such improper motive played a significant part in the legislative pro-

cess. 25 *N.J.Tax* at 316. The court did not "weigh" evidence, but instead found that there was a lack of such evidence.

We conclude that there was no genuine issue of material fact in dispute warranting further proceedings before the trial court.

Affirmed.