**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1253-16T3

TROOPER  JUSTINE  POSER  (BADGE
No. 5910),

    Plaintiff-Appellant,

v.

STATE OF NEW JERSEY, DIVISION
OF STATE POLICE OF THE STATE
OF NEW JERSEY, DEPARTMENT[1] OF
LAW   AND   PUBLIC   SAFETY,
COLONEL  RICK  FUENTES,  and
MAJOR HUGH JOHNSON (Ret.),

    Defendants-Respondents.

---

        Argued  telephonically  January  24,  2018  —
        Decided June 22, 2018

        Judges  Simonelli,  Rothstadt,  and  Gooden
        Brown.

        On appeal from Superior Court of New Jersey,
        Law  Division,  Mercer  County,  Docket  No.
        L-0069-14.

        George  T.  Daggett  argued  the  cause  for
        appellant.

        Tasha  M.  Bradt,  Deputy  Attorney  General,
        argued  the  cause  for  respondents  (Gurbir S.
        Grewal, Attorney General, attorney; Melissa

---

[1]  Improperly pled as Division.

H. Raksa, Assistant Attorney General, of counsel; Tasha M. Bradt, on the brief).

PER CURIAM

Plaintiff Justine Poser, a member of the New Jersey Division of State Police, appeals from a November 18, 2016 Law Division order upholding its August 5, 2016 order granting summary judgment to defendants, the State of New Jersey, the New Jersey Division of State Police, Colonel Rick Fuentes, Major Hugh Johnson, and John Does 1-5 (collectively defendants), and dismissing her complaint with prejudice. In her complaint, plaintiff asserted a cause of action for retaliation under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, alleging defendants transferred her to another unit as retaliation for filing a complaint against a superior. In granting summary judgment, the motion judge concluded plaintiff had failed to raise disputed issues of material facts required to establish a prima facie case of retaliation and withstand summary judgment. On plaintiff's motion for reconsideration, the judge maintained his position.

At the outset, we point out that plaintiff's notice of appeal only identified the November 18, 2016 order denying her motion for reconsideration. If the notice of appeal "designates only the order entered on a motion for reconsideration, it is only that proceeding and not the order that generated the

reconsideration motion that may be reviewed." Pressler & Verniero, Current N.J. Court Rules, cmt. 6.1 on R. 2:5-1(f)(1) (2018). However, because defendants have not objected to our review of the August 5, 2016 order granting them summary judgment, and addressed the summary judgment motion in their merits brief, we may address the merits of the summary judgment motion. See W.H. Indus., Inc. v. Fundicao Balancins, Ltda, 397 N.J. Super. 455, 458 (App. Div. 2008). That being said, we agree with the judge's ruling on the summary judgment motion and affirm.

We derive the following facts from evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, and view them in the light most favorable to plaintiff. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995)). Plaintiff graduated from the 121st class of the State Police Academy on April 21, 2001. She worked in various positions for ten years until 2011, when she transferred to the Digital Technology Investigations Unit (DTIU), "which makes use of federally funded technology, via the Internet Crimes Against Children (ICAC) grant, to investigate internet crimes against children." Approximately six months later, she attended Criminal Investigation School in order to

become a detective in the DTIU.

The facts giving rise to the complaint first unfolded in September 2012. Plaintiff was having breakfast with fellow DTIU Detectives Chris Sciortino and Chris DeAngelis, when Sciortino disclosed that DTIU Detective Sergeant First Class Charles Allen, their superior officer, had asked him to remove pornography from his computer. Sciortino speculated that Allen wanted to remove the files in anticipation of an upcoming federal audit on the DTIU's use of federal funds. Although Sciortino was unable to remove the file, titled "gangbang," he told plaintiff and DeAngelis that while he was working on the computer, Allen had commented on "the actual adult porn sites" he liked to visit.

Plaintiff told Sciortino he should report the incident, but Sciortino "wanted to leave it alone." A few days later, plaintiff discussed Sciortino's comments with Detectives Erin Micciulla and Chris Camm. Camm, who was in charge of maintaining training laptops, told plaintiff and Micciulla about an incident where he had found a missing laptop in Allen's office, "connected to the undercover network and . . . downloading adult pornography." Camm said he did not do anything about the incident out of fear. Plaintiff and Micciulla found Allen's actions "completely unacceptable" in

light of the DTIU's focus on "combat[ing] sexual exploitation of children."

Micciulla reported the incident to Lieutenant Joe Glennon, who said he needed "to get [his] ducks in order before [he did] anything." Upset by Glennon's inaction, plaintiff and Micciulla filed a complaint with the Office of Professional Standards (OPS) on September 27, 2012. In their complaint, they stressed the urgent need for a response, as Allen could delete the evidence from the computers before OPS could investigate. OPS sent a trooper to remove the equipment from the DTIU later that same day.

Plaintiff also filed a report with the Equal Employment Opportunity Office (EEO) because of the "harassing" and "sexual nature" of Allen's actions. In her interview with EEO, plaintiff reported feeling "extremely uncomfortable" dealing "with a supervisor [who was] downloading and viewing [pornography] for his personal pleasure in his office while at work." She called Allen's conduct "disgusting," and said she "did not want to physically touch his computers."

Within a few days of filing the report, Allen was detached[2] to the Cyber Crimes Unit, located "directly across the hall from

_____

[2]  In her deposition, plaintiff said "detachment is what the State Police does when they need to quickly move somebody."

the [DTIU]." Shortly thereafter, plaintiff again complained to OPS and EEO that she was still uncomfortable with Allen's proximity to her, as they still saw each other every day, parked in the same lot, and used the same door. Both OPS and EEO informed her there was "nothing [they could] do about that."

On January 16, 2013, Major Hugh Johnson, head of the Special Investigation Section, promoted plaintiff to Acting Detective Sergeant of the Evidence Management Unit (EMU), which was "responsible for the handling and care of all evidence in the custody of the State Police." The EMU, located at Division Headquarters in West Trenton, was in a different location from the DTIU. Her transfer was to become effective on January 26, 2013.[3] When Glennon called plaintiff to inform her about her promotion and transfer, plaintiff told him she did not want the position. Glennon attempted to convince plaintiff the move would benefit her career, but, when she still refused, he said,

---

[3] Johnson certified that when the position of Detective Sergeant at the EMU became available, another officer who already worked in the unit was selected for the promotion. However, during a routine check of that officer's background, Johnson discovered he was the subject of an OPS investigation and, therefore, ineligible for promotion. As a result, he gave the promotion to plaintiff because she was "the next individual on the list" for a promotion to Sergeant. Johnson certified that although he was aware of the internal complaint filed against Allen, he did not know who had filed the complaint because that information was confidential. He also averred he was "unaware of any other promotional opportunities" when he promoted and transferred plaintiff to the EMU.

"Justine, the Major's not asking you, he's telling you."

At the time of her transfer, plaintiff ranked first in the State Police Ranking System, which meant she was first up for Sergeant in the DTIU. The State Police awarded promotions based on a ranking system, and transfers did not require employee consent before becoming effective. Nonetheless, plaintiff believed her promotion and transfer to the EMU, over her objections, violated the State Police's practice of discussing promotions with the recipient in advance to determine if the move was personally and professionally beneficial to the recipient.

Two days after the announcement of plaintiff's transfer, Detective Ryan Hoppock of the Cyber Unit, where Allen was detached, overheard Allen telling Cyber Unit Lieutenant Stanley Field that plaintiff had "got[ten] what she deserved because she made a complaint." Hoppock also heard the men saying plaintiff and Micciulla were both on a "bury list" and would "get [theirs] for what [they] said." Hoppock reported the comments to Micciulla, who told plaintiff.

When plaintiff first arrived at the EMU, another member of the unit asked, "[W]ho did you piss off?" Later, the EMU Lieutenant told plaintiff he was sorry she had been transferred to their unit because they were "the misfits of the State

A-1253-16T3

Police." Five days after plaintiff's transfer to the EMU became effective, DeAngelis was promoted to Acting Detective Sergeant at the DTIU, effective February 9, 2013.

Plaintiff felt that working at the EMU was "demeaning" because "the individuals [who] work[ed] there were either sent there because they got in trouble . . . or they were physically . . . disabled." According to plaintiff, "it was known[] that [the EMU] . . . is where you go when you're in trouble or injured." She found the work "mundane," and described the evidence repository as "dirty, dingy, . . . smelly," "disgusting," and "foul." Plaintiff thought the transfer was unwarranted and done as "punishment for . . . filing [a complaint] against . . . two senior members" of the State Police.

On February 13, 2013, plaintiff submitted a "written special report requesting a transfer back to [the DTIU.]" The State Police approved her request and agreed to transfer her back to the DTIU "as soon as . . . operationally feasible." However, plaintiff did not receive a response to her request until the paperwork "appeared on [her] desk" in April 2014. In May 2014, she was transferred to the Cyber Crimes Unit[4] and her

---

[4] Allen was no longer detached to the Cyber Crimes Unit when plaintiff transferred there.

promotion to Sergeant was finalized.

By leave granted, on February 19, 2016, plaintiff filed an amended four-count complaint alleging defendants had violated her rights under CEPA. Specifically, she claimed her transfer to the EMU, over her objection, was retaliation for reporting Allen's illegal use of federally-funded technology to download pornography. After discovery was completed, defendants moved for summary judgment, arguing that plaintiff had failed to make out a prima facie case under CEPA. On August 5, 2016, after oral argument, the motion judge granted defendants' motion.

Referring to the "four elements in a CEPA claim," the judge concluded that plaintiff had established the first two elements of a prima facie claim, as there was no factual dispute that plaintiff reasonably believed "[d]ownloading adult pornography on [the] State's leased computers . . . was a violation of a law, rule[,] or public policy." Next, the judge determined that plaintiff "complain[ing] about it and [bringing] it to people's attention" was a protected whistleblowing activity. However, the judge found plaintiff had failed to establish the third element, which requires an adverse employment action. In fact, the judge found her promotion was "a reward for bringing it up," or a "favorable action," even if it meant a longer commute and a

longer workweek.[5]

The judge explained:

> I understand it was a transfer, a different location, and I understand she had to drive further to get to work, but she works for the State Police. If she worked for a municipality that only had offices in the municipality and for some reason they're now sending her far, far away, maybe I could get there. But the State Police operate all around the [S]tate of New Jersey. . . . So I can't draw an inference that . . . it's an adverse action just because she says she has to drive longer.
>
> I understand she used to have four-day workweeks, and now she's got five-day workweeks, but where's the evidence that shows that that's something she was entitled to, that that was supposed to be a career-long position in the first place, . . . that this was something she had that . . . constituted some kind of entitlement, or right, or property, or something, so that if it was [lost] that it's worth compensating. I don't have anything like that.

According to the judge, the only adverse consequence of plaintiff's transfer was the loss of overtime, but she had not provided any evidence of lost income. Further, the judge rejected plaintiff's contention that "the timing of things" supported her retaliation claim.

Plaintiff filed a motion for reconsideration pursuant to

---

[5] At DTIU, "[p]laintiff worked four ten-hour shifts." At the EMU, "she worked five eight-hour shifts."

Rule 4:49-2, which the judge entertained. However, after oral argument on November 18, 2016, the judge denied plaintiff's motion and affirmed his initial decision granting summary judgment in favor of defendants. This appeal followed.

We review a ruling on a motion for summary judgment de novo and apply the same standard as the trial court. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (citation omitted). Thus, we consider, as the motion judge did, "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540.

"If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013). "[F]or mixed questions of law and fact, [we] give[] deference . . . to the supported factual findings of the trial court, but review[] de novo the

lower court's application of any legal rules to such factual findings." State v. Pierre, 223 N.J. 560, 577 (2015) (first alteration in original) (quoting State v. Harris, 181 N.J. 391, 416 (2004)).

This standard compels the grant of summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "To defeat a motion for summary judgment, the opponent must 'come forward with evidence that creates a genuine issue of material fact.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)). "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion[.]" Puder v. Buechel, 183 N.J. 428, 440-41 (2005) (citation omitted). Applying the above standards, we discern no reason to reverse the grant of summary judgment.

CEPA seeks to eliminate "vindictive employment practices" by prohibiting employers from taking "any retaliatory action[,]" Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 418 (1994), against an employee who:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or

> (2) is fraudulent or criminal . . . ;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer . . . ; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;

> (2) is fraudulent or criminal . . . ; or

> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]

To establish a prima facie claim under CEPA, a plaintiff must prove each of the following:

> (1) he or she reasonably believed that his or her employer's conduct was violating

either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

(2) he or she performed a "whistle-blowing" activity described in [N.J.S.A.] 34:19-3(c);

(3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

If a plaintiff makes this threshold showing, the burden shifts to the defendant to set forth a legitimate non-retaliatory reason for the adverse action. Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005) (citation omitted). "If such reasons are proffered, plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual." Id. at 39 (citation omitted).

Here, the motion judge found plaintiff had successfully established the first element of a CEPA claim, and during oral argument on their summary judgment motion defense counsel conceded, "Nobody disputes, by the way, that Allen using a State computer to download pornography is something that we don't want to have. Nobody disputes that." The judge also determined that

plaintiff successfully established the second element, finding that her reports to OPS, "which is like an internal affairs department," and EEO were protected whistleblowing activities. However, the judge concluded plaintiff failed to establish the third element because a promotion did not constitute an adverse employment action.

CEPA defines retaliation as "the discharge, suspension[,] or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). However, as our Supreme Court clarified, "the universe of possible retaliatory actions under CEPA is greater than discharge, suspension, and demotion[,]" as evidenced by the statute's express inclusion of "other adverse employment action taken against an employee in the terms and conditions of employment." Donelson v. DuPont Chambers Works, 206 N.J. 243, 257 (2011) (quoting N.J.S.A. 34:19-2(e)).

Indeed, "adverse employment action" may include such things as "making false accusations of misconduct, giving negative performance reviews, issuing an unwarranted suspension, and requiring pretextual mental-health evaluations[.]" Id. at 258. In addition, an act of retaliation "need not be a single discrete" event. Green v. Jersey City Bd. of Educ., 177 N.J.

15                                                    A-1253-16T3

434, 448 (2003). Instead, an employee may point to "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Ibid. Thus, when deciding whether an employer's action constitutes retaliation, courts should view the question "in light of the broad remedial purpose of CEPA[.]" Donelson, 206 N.J. at 257.

However, "not every employment action that makes an employee unhappy constitutes 'an actionable adverse action.'" Nardello v. Twp. of Vorhees, 377 N.J. Super. 428, 434 (App. Div. 2005) (quoting Cokus v. Bristol Myers Squibb Co., 362 N.J. Super. 366, 378 (Law Div. 2002), aff'd, 362 N.J. Super. 245 (App. Div. 2003)). To be actionable, "an allegedly retaliatory act must be 'sufficiently severe or pervasive to have altered plaintiff's conditions of employment in an important and material manner.'" El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 176 (App. Div. 2005) (quoting Cokus v. Bristol-Myers Squibb Co., 362 N.J. Super. 245, 246 (App. Div. 2003)). Incidents that cause a "bruised ego or injured pride[,]" Beasley v. Passaic Cty., 377 N.J. Super. 585, 607 (App. Div. 2005) (quoting Klein, 377 N.J. Super. at 46), or that make an employee's job "mildly unpleasant" but do not have a substantial

16

impact on the terms and conditions of employment, <u>Hancock v. Borough of Oaklyn</u>, 347 N.J. Super. 350, 360 (App. Div. 2002), are insufficient to prove actionable retaliation.

Applying these principles, we agree with the motion judge that plaintiff did not suffer an adverse employment action. Plaintiff does not dispute that her transfer was not a demotion and did not result in a loss of status, reduction in pay, or diminution in job responsibilities. <u>See</u> <u>Mancini v. Twp. of Teaneck</u>, 349 N.J. Super. 527, 564 (App. Div. 2002). Nevertheless, plaintiff argues, her transfer from the DTIU to the EMU was an adverse employment action because it put her "in a worse position than she was before . . . physically, monetarily[,] and [in] the nature of her employment." According to plaintiff, had she not been transferred to the EMU, within a few days, she would have become a Sergeant at the DTIU, where she was "highly specialized," as evidenced by DeAngelis' promotion five days after her transfer to the EMU.

Plaintiff cites the timing of the transfer and the EMU's reputation as the unit of "misfits," as well as other disadvantages from her transfer, as further proof that her promotion was retaliatory. Specifically, she points out that she transferred to the EMU as "Acting Sergeant," and therefore, she would have to wait 120 days to receive the raise that

accompanied the promotion. She also complains of a loss of overtime opportunities due to the EMU's lighter workload, a longer commute by twenty minutes, and a longer workweek, which required her to incur additional childcare costs.

Plaintiff's grievances do not rise to the level of an actionable adverse employment action because, by all accounts, her transfer was a promotion. Plaintiff's complaints regarding the EMU's reputation are akin to "a bruised ego or injured pride on the part of the employee," which are not actionable employment consequences under CEPA. Klein, 377 N.J. Super. at 46. Plaintiff's objection to her transfer and her belief that her skills were better suited to the DTIU do not convert a promotion to actionable retaliation. Mancini, 349 N.J. Super. at 564-65 (holding that an adverse employment action does not occur simply because an employee is unhappy).

Plaintiff's remaining complaints are similarly unavailing. During her deposition, she admitted that she still had overtime opportunities at the EMU, but had to apply for special assignments instead of working on cases related to her unit. This, in addition to the longer workweek with shorter days and the twenty minutes added to her commute, might have made her job "mildly unpleasant" but did not have a sufficient impact on the terms and conditions of her employment to prove actionable

retaliation.  See Hancock, 347 N.J. Super. at 360.

Thus, we conclude plaintiff failed to establish a prima facie case under CEPA, and the motion judge properly granted summary judgment to defendants and properly denied plaintiff's motion for reconsideration.  Because of our conclusion, we need not address plaintiff's arguments regarding the causal connection between plaintiff's whistleblowing activity and the transfer, defendants' purportedly pretextual reasons for the transfer, or the denial of her reconsideration motion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION